1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MARYLAND
2                         SOUTHERN DIVISION

3    UNITED STATES OF AMERICA       Criminal No.  RWT-12-0480

4          v.                       Greenbelt, Maryland

5    JOSE JOAQUIN MORALES,          October 3, 2013

6              Defendant.           9:30 a.m.

7    -------------------------/

8                    TESTIMONY OF MARSHAWN STOKES
                   BEFORE THE HONORABLE ROGER W. TITUS
9                 UNITED STATES DISTRICT JUDGE, and a jury

10   APPEARANCES:

11   For the Government:      United States Attorney's Office
                             By: SANDRA WILKINSON, ESQUIRE
12                               MARTIN CLARKE, ESQUIRE
                             36 South Charles Street
13                           Fourth Floor
                             Baltimore, Maryland  21201
14

15   For the Defendant:      Law Offices of Gary E. Proctor LLC
                             By: GARY EDWARD PROCTOR, ESQUIRE
16                           Eight East Mulberry Street
                             Baltimore, Maryland 21202
17

18                           Law Office of Jonathan Zucker
                             By: JONATHAN S. ZUCKER, ESQUIRE
19                           1350 Connecticut Avenue, NW
                             Suite 202
20                           Washington, D.C. 20036

21

22   Court Reporter          Lisa K. Bankins RMR
                             United States District Court
23                           6500 Cherrywood Lane
                             Greenbelt, Maryland 20770

24

25   Proceedings recorded by mechanical stenography,
     transcript produced by notereading.

```
 1                      TABLE OF CONTENTS
                             TRIAL
 2                          WITNESSES

 3    On behalf of the Government:

 4    MARSHAWN STOKES

 5    Cross-examination by Mr. Zucker........ 47

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

DIRECT EXAMINATION OF STOKES

1                          E X C E R P T

2              THE COURT:  All right.  We may resume with this

3      witness.

4              MR. CLARKE:  Thank you, Your Honor.  Your Honor,

5      can I ask that he be reminded of his continuing oath?

6              THE COURT:  Yes.  You remain under oath, sir.

7              BY MR. CLARKE:

8       Q     Mr. Stokes, I think we left off yesterday with

9      the time period when you asked your mother, Brenda Stokes,

10     to contact the U.S. Attorney's Office.  Is that correct?

11      A     Yes.

12      Q     And did you specifically have the name of

13     somebody that you wanted your mother to contact?

14      A     Ms. Sandra Wilkinson.

15      Q     Repeat that, please.

16      A     Ms. Sandra Wilkinson.

17      Q     And how did you get the name of Sandra

18     Wilkinson?

19      A     From Mr. Morales.

20      Q     And what if anything did he say about Ms. Sandra

21     Wilkinson as to who she was and why he was mentioning her?

22      A     He just said that she was the prosecuting

23     attorney against him and he was just talking negatively

24     about her, saying that she wasn't as smart as she thought

25     she was and things like that.

                                                            33

DIRECT EXAMINATION OF STOKES

1    Q    So you figured that the letter should get to

2  her?

3    A    Yes.

4    Q    And did you show your mother that?

5    A    The letter that I mailed?

6    Q    Yes.

7    A    Yes.

8    Q    All right.  I had also asked you if you knew the

9  name of Troy after Mr. Morales told you this story in the

10 summer of 2012 and you said at first you did not.  Is that

11 correct?

12   A    Yes.

13   Q    And then I asked you if there came a time when

14 you did learn his last name and that's when you started

15 talking about this letter.  Correct?

16   A    Yes.

17   Q    When you were subpoenaed to come to the grand

18 jury and testify on September 11th of 2012, did you see

19 your letter again that day?

20   A    Yes.

21   Q    And were you being interviewed prior to your

22 testimony before the grand jury when you saw that letter?

23 In other words, where did you see the letter, sir, again?

24   A    When I came in for the grand jury hearing.

25   Q    At the courthouse?

1    A    Yes.

2    Q    And is that when you first told the authorities

3  about this letter?

4    A    Yes.

5    Q    And at that point in time did the authorities

6  have the letter?

7    A    No.

8    Q    And so what happened in your presence?

9    A    The agent called my mom and my father and

10  requested that they bring the letter down to you guys.

11    Q    And in fact was that letter brought to us?

12    A    Yes.

13    Q    And you've already identified Government's

14  Exhibit Number S-3 as being that letter.  Is that correct?

15    A    Yes.

16    Q    And you've already testified that in that

17  letter, you had put your eyeglass prescription; is that

18  correct, as S-4?

19    A    Yes.

20    Q    When you looked at the letter in Baltimore, was

21  your prescription in there?

22    A    Yes.

23    Q    Did you ever get your eyeglasses?

24    A    Yes.

25    Q    And yesterday, you talked about S-5, which is

1    some magazine pages and some articles and S-7.  Correct?

2         A    Yes.

3         Q    Another set of magazine articles.  Correct?

4         A    Yes.

5         Q    And they're the ones that you wanted to have

6    when you arrived in Baltimore?

7         A    Yes.

8         Q    And were they also in the envelope at the

9    courthouse when you saw it on September the 11th of 2012?

10        A    Yes.

11        Q    I'm now showing you S-10.  I don't believe I

12   showed you this yesterday.  Did I show you this yesterday,

13   sir?

14        A    No, sir.

15        Q    All right.  And do you recognize that?

16        A    Yes.

17        Q    What is it?

18        A    There are two phone numbers.  One of a guy named

19   Philly P that was in Allenwood in 1-A with Jose and I and

20   a number to a female friend of mine is at the bottom.

21        Q    Would you please read this name here?

22        A    Philly P.

23        Q    And who wrote this, sir?

24        A    If I'm not mistaken, Philly P wrote that.

25        Q    And why did Philly P write this to you and why

1   do you have it?

2              MR. ZUCKER:  Objection to why Philly P wrote it

3   to him.

4              BY MR. CLARKE:

5        Q    Well, how is it that you came into possession of

6   a note with Philly P writing on it?

7        A    Well, he gave it to me for Mr. Morales.  It was

8   about to get some drugs --

9              MR. ZUCKER:  Objection.  The basis is obviously

10  hearsay.

11             THE COURT:  All right.  Sustained.  Just answer

12  the question, who gave it to you.

13             BY MR. CLARKE:

14       Q    Whose handwriting is on the bottom?

15       A    That's mine.

16       Q    And whose handwriting is above it?

17       A    That's Philly P's.

18       Q    Did you include that in the envelope to be sent

19  to Baltimore?

20       A    Yes.

21       Q    I'm showing you Government's Exhibit S-9.  Do

22  you recognize that, sir?

23       A    Yes.

24       Q    What is it?

25       A    That's the phone number of another guy that was

DIRECT EXAMINATION OF STOKES

```
 1   at Allenwood on 1-A with us named Steve Silverman.  That's
 2   his mother's phone number.
 3        Q    And whose handwriting is that?
 4        A    He wrote the number and I wrote his mother's
 5   name at the bottom.
 6        Q    And why did he give this to you?
 7             MR. ZUCKER:  Objection.
 8             THE COURT:  If he knows.
 9             MR. CLARKE:  It's not for the truth of the
10   matter, Your Honor.
11             THE COURT:  For what purpose are you offering
12   it?
13             MR. CLARKE:  For the purposes that he has a
14   reason for having this in the letter.
15             THE COURT:  All right.  Overruled.
16             THE WITNESS:  He just -- he didn't have phone
17   privileges at the time and he needed some money.  So he
18   just asked when I got to Baltimore to call his mother or
19   have my mother call to send him some money.
20             BY MR. CLARKE:
21        Q    Showing you S-8.  And was S-9, the one I just
22   showed you, was that also in the envelope?
23        A    Yes.
24        Q    And do you recognize S-8?
25        A    Yes.
```

1    Q    What is it?

2    A    It's my handwriting.  Exactly what I wrote that

3  for, I'm sure by looking at it, it has to do with some

4  type of business or it can even to do with law.  I usually

5  write things down.  Being as though my property was

6  already gone and I only had the letter, if I see something

7  on T.V. or I see something of interest, I'll just write

8  the information down.  So right now, I can't really

9  remember what is it, you know, what it was, the purpose.

10  But it had to be law or business for me to write it down.

11    Q    All right, sir.  It appears to be a Internet

12  address?

13    A    Yes.

14    Q    Would you have Internet access once you got to

15  Baltimore?

16    A    No.  Not Internet access.  No.

17    Q    All right.  And who's Elgin James?

18    A    Like I said, off the top of my head, I don't

19  know.  It must have came off of T.V. or a book or

20  something that I saw and I just thought it was something

21  of interest so I wrote it down.

22    Q    So you don't recognize what little birds mean?

23    A    No.

24    Q    This was a note to yourself?

25    A    Yes.

DIRECT EXAMINATION OF STOKES

1     Q    Today you can't recall what it was about?

2     A    No.

3     Q    I'm showing you Government's Exhibit S-11.  What

4     is that, sir?

5     A    A little plastic bag that if I'm not mistaken,

6     that little ear buds -- earphones come in.

7     Q    All right.  And was that also included?

8     A    Yes.

9     Q    And why was that included?

10    A    That was included because the note that Mr.

11    Morales gave me, I put it inside of that.

12    Q    And why did you put it inside of that?

13    A    So that my mom wouldn't touch it.

14    Q    And why didn't you want your mom to touch it?

15    A    Because Mr. Morales had touched it and he had

16    wrote something on it and I didn't want my mother's

17    fingerprints to be on it.

18    Q    What was your intention once this got to the

19    authorities?

20    A    That maybe Mr. Morales' fingerprints would be on

21    it.

22    Q    Showing you Government's Exhibit S-6.  Do you

23    recognize that, sir?

24    A    Yes.

25    Q    What is it?

DIRECT EXAMINATION OF STOKES

1      A     It's Jose Morales' name, his mother's address,

2  his I.D. number, his mother's phone number and his

3  sister's phone number.

4      Q     And who wrote that, sir?

5      A     Mr. Morales.

6      Q     And was this color purple when he gave it to

7  you?

8      A     No.

9      Q     All right.  Was this scale tag also on there

10 when he gave it to you?

11     A     No.

12     Q     I'm showing you Government's Exhibit S-21.  Is

13 this how it appeared, sir, when he gave it to you without

14 that tag and without the purple coloring?

15     A     Yes.

16     Q     And can you tell us what this information on the

17 front was supposed to be about?  In other words, did Mr.

18 Morales ask you to do anything in reference to the

19 information he had written on this note?

20     A     Well, it was several things.  Probably of the

21 most important, when he told me Mr. Troy Lucas' name, he

22 wanted me to see if he was in the jail when I came down to

23 CTF in Baltimore and he said to find out if Mr. Troy Lucas

24 was incarcerated.  And if so, to let his mom or sister

25 know so they can notify him.

DIRECT EXAMINATION OF STOKES

1    Q    And did he say why he wanted to know if Troy

2   Lucas was at the Federal Detention Center in Baltimore?

3    A    Well, Mr. Morales assumed that if Mr. Troy Lucas

4   was in fact incarcerated at CTF in Baltimore that he

5   probably was cooperating with the government.

6    Q    As to what case?

7    A    This current case now.

8    Q    In terms of the story that he had told you?

9    A    Yes.

10   Q    And whose address was this supposed to be?

11   A    His mom's.

12   Q    And that's her phone number?

13   A    Yes.

14   Q    And who is Carmenza?

15   A    His sister.

16   Q    And showing you again, that's 21, he provided

17   the phone number for his sister, Carmenza.  Correct?

18   A    Yes.

19   Q    And do you recognize any of this up here in the

20   corner of Government's S-6, that scratch math?

21   A    Vaguely.  I mean it was, you know, of no

22   importance, but I vaguely remember it being there, just

23   like scribble or something.

24   Q    Did you put that there?

25   A    No.

DIRECT EXAMINATION OF STOKES

1      Q      Do you know who put that there?

2      A      I would have to assume Mr. Morales.

3      Q      But you don't know as to that?

4      A      No.

5      Q      All right.  And do you know -- can you tell us

6  how it came to be that he gave you S-6?  In other words,

7  where did this take place?

8      A      On Unit 1-A.  We walked up to his cell.  I

9  waited outside the door.  He went in and he was telling me

10  about he was going to write the information down.  So he

11  went into his cell to retrieve the piece of paper.  He

12  wrote down the information and one of the phone numbers at

13  this time, I can't remember which one, either his mom or

14  his sister's, he didn't know right offhand.  So even

15  though he wrote everything down he showed me, he told me

16  to wait.  He had to call one or the other to get the

17  other's phone number.  So then later on, he actually gave

18  me the paper later on.

19      Q      All right.  And when he went into his cell --

20      A      Yes.

21      Q      -- were you present there with him?

22      A      Yes.  Standing right in front of the door.

23      Q      In front of the door?

24      A      Yes.

25      Q      And do you know where he got this piece of

43

DIRECT EXAMINATION OF STOKES

1    paper?

2        A    From inside his cell.

3        Q    I understand.  But do you know specifically

4    where he obtained this piece of paper?

5        A    It looks to be --

6        Q    I'm not asking what it looks to be, sir.  I'm

7    asking you if you saw him get this paper?

8        A    Oh, did I see him get the paper?

9        Q    Yeah.  Did you see how he -- it appears to be

10   torn, sir.

11       A    Right.

12       Q    I'm asking you if you know the origin of this

13   piece of paper --

14       A    Yes.  It came --

15       Q    Listen to me.  Not what's written on it.  I'm

16   asking you if you know the origin of this torn piece of

17   paper?

18       A    It came from a sheet that we have.  It's like a

19   complaint form or a piece -- a form that you fill

20   something out to the case managers or things like that.

21   It's a torn piece of paper off of that.

22       Q    And what are those forms used for?

23       A    Like I said, complaints or getting in contact

24   with your case management or other staff members, things

25   of that nature.

1    Q    So is this a Bureau of Prison form that you used

2    to communicate with the prison staff?

3    A    Yes.

4    Q    And you've already testified that he wanted you

5    to get in contact with his mom or his sister and tell them

6    information about Troy.  And was his name also to be

7    written down on this piece of paper so you remember it?

8    A    Yes.  But not -- by alphabets.

9    Q    I'm showing you the back of S-6.  I want to draw

10   your attention to the bottom where it says this form

11   replaces BP148-070 dated October '86 and BPS148-070.

12   April '94.  Do you see that, sir?

13   A    Yes.

14   Q    Do you recognize that type of form writing?

15   A    Yes.  They are laid out daily on the police's

16   station for us to grab them at will in case someone needs

17   to use them.

18   Q    All right.  And do you know if this date was

19   already on that form or do you know?

20   A    Yes.  It had to have been.  I didn't write it.

21   When he handed it to me, it was there.

22   Q    I understand.  And sir, how about this writing

23   above?

24   A    That would be -- that was also on there.

25   Q    All right.  And what did you think that was?

DIRECT EXAMINATION OF STOKES

1        A    I know Mr. Morales explained to me that was Troy

2   Lucas name spelled with numbers just to I guess throw

3   anybody off who first initially looked at it.  But I would

4   know what it is.  It's Troy Lucas' name.  It was just so I

5   could remember it.

6        Q    Without writing his name?

7        A    Without writing his name.

8        Q    And did you compare these numbers that are

9   written here with the letters of the alphabet?

10       A    No.  I never actually did.  But I assumed that's

11  what it was.  That's what he told me.

12       Q    You testified earlier that you included S-11 in

13  your letter and that you put something in it.  What was

14  the something that you put in it?

15       A    The piece of paper you just had on the screen

16  previously.

17       Q    S-6.  Correct?

18       A    Yes.

19            MR. CLARKE:  One moment, Your Honor, please.

20            (Pause.)

21            BY MR. CLARKE:

22       Q    Mr. Stokes, after you testified in front of the

23  grand jury, were you returned to Allenwood, Pennsylvania?

24       A    Yes, sir.

25       Q    And how long did you stay there?

DIRECT EXAMINATION OF STOKES

1      A      From October to April.

2      Q      And were you put back in your original cell?

3      A      No.  Not in my original cell, but I went back to

4  my original unit just for one day.  Not even a day.  Maybe

5  from 9:30 that night to 6:00 in the morning.

6      Q      All right.  And were you in the same area of the

7  prison where Mr. Morales was?

8      A      Well, when I got back, Mr. Morales was gone.

9      Q      After you initially spoke to the authorities on

10  July I believe it was the 30th of 2012, did you send

11  letters or other information about conversations you had

12  had with Mr. Morales after that date?

13      A      Yes.

14      Q      And just so we're clear, you were only together

15  about another month after that meeting that you had with

16  the authorities.  That is you said that the meeting

17  happened around July 30th of 2012 and that you left in the

18  first week of September.  Is that correct?

19      A      Yes.

20              MR. CLARKE:  I have no other questions of this

21  witness at this time, Your Honor.

22              THE COURT:  Cross-examination.

23              MR. ZUCKER:  Thank you, judge.

24                      CROSS-EXAMINATION

25              BY MR. ZUCKER:

1       Q    Good morning, Mr. Stokes.

2       A    Hello.

3       Q    So Mr. Stokes, you are currently serving a life

4   sentence without the possibility of parole.  Is that

5   correct?

6       A    Yes, sir.

7       Q    And that's based on your having been convicted

8   of an ongoing RICO conspiracy as well as two murders.  Is

9   that correct?

10      A    No, sir.

11      Q    The murders were in furtherance of the RICO

12  conspiracy?

13      A    It was one, not two.

14      Q    Weren't you convicted of two murders, sir?

15      A    No, sir.

16           MR. ZUCKER:  Moment to consult.

17           MR. CLARKE:  May we approach with the clerk,

18  Your Honor?

19           (Pause.)

20           BY MR. ZUCKER:

21      Q    In any event, you are serving life without

22  parole involving a murder.  Correct?

23      A    Yes, sir.

24      Q    And in that case, you received as the prosecutor

25  pointed out an upward adjustment for obstruction of

CROSS-EXAMINATION OF STOKES

1    justice.  Is that correct?

2        A    I think so.  Yes.

3        Q    Well, in particular -- while all those charges

4    were pending against you, you conspired with other people

5    to kill several witnesses; isn't that correct, unless they

6    would refuse to testify?

7        A    No, sir.

8        Q    That's not correct.  That was the basis, part of

9    the basis for the upward adjustment.  Wasn't that in your

10   case, sir, conspiring to kill witnesses?

11       A    When I say no, sir, I didn't remember them

12   saying anything about killing --

13       Q    You got to keep your voice up.

14       A    I said I didn't remember them saying anything

15   about killing anyone.  It was just talking to other people

16   about not showing up for court.

17       Q    I guess let me make sure -- maybe my question

18   wasn't as clear as I should have been.  I didn't say you

19   were given an upward adjustment for killing people.  It

20   was for conspiring to kill people unless they refused to

21   testify.  Is that consistent now with your recollection?

22       A    Yes, sir.

23       Q    Okay.  And in addition, you suborned perjury by

24   having Holly Brown, one of the witnesses in your case,

25   come in and give false testimony contradictory to other

1    testimony she had given earlier.  Isn't that correct?

2         A    From my recollection, sir, that's what they

3    said.  But that wasn't true.

4         Q    I see.  And similarly, you threatened to kill or

5    intimidate a witness named Danielle Turner.  Correct?

6         A    No, sir.

7         Q    That didn't occur in the gym of BCDC in April of

8    1999 where you told her not to come to court?

9         A    No.  Then once again, we spoke.  It was never a

10   threat, sir.

11        Q    I see.  So you spoke to her and tried to

12   encourage her not to come?

13        A    No.  I asked her why was she testifying against

14   me.  That was my co-defendants' cousin, their first

15   cousin.

16        Q    And the purpose of that conversation was to

17   discourage her from testifying as she had previously.

18   Isn't that correct?

19        A    I said I just asked her why was she testifying.

20   I didn't ask her not to come.

21        Q    But what was the purpose of the conversation

22   from your perspective?  You were just curious?

23        A    We are like family.  I knew her for a long time.

24   My two co-defendants, as I said, she is their first

25   cousin.  They have the same mothers, brothers, you know,

1    all of that.  So I just asked her why was she testifying.

2         Q    And was it not your intent to hope that she

3    would be discouraged from testifying against you?  That

4    was part of the basis for the upward adjustment, wasn't

5    it, sir?

6         A    Well, yeah.  Of course, I wouldn't want her to.

7    But yes.

8         Q    And you actually wrote letters to the residents

9    of Schering Road, including someone named Askia and

10   Williams to confront witnesses, to confront witnesses and

11   name those witnesses and make sure they weren't going to

12   cooperate and that they would sign false affidavits.

13   Isn't that correct, sir?

14        A    No, sir.  Not false affidavits --

15        MR. CLARKE:  May he finish his answer, Your

16   Honor?

17        THE WITNESS:  Mr. Askia that you named and

18   Cornell Williams that you named are the first cousins of

19   Danielle Turner that we were just previously talking

20   about.  And of course, I asked them to talk to their

21   cousin in reference to why she was testifying against all

22   of us.  Not just me, but her own cousins as well.

23        BY MR. ZUCKER:

24        Q    I see.  And was it not your communication to

25   tell them, to make sure they were not going to cooperate

CROSS-EXAMINATION OF STOKES

1    and to try and get them to sign affidavits?

2        A    I probably did ask them to sign affidavits.

3        Q    And to basically you were asking -- you were

4    intimidating witnesses who were witnesses against you;

5    isn't that correct, sir?  Trying to obstruct justice?

6        A    Well, I don't necessarily think that asking

7    someone to sign a affidavit is a threat.  The defense asks

8    people to sign affidavits all the time.  I don't think

9    that's a threat.  You just want that person --

10       Q    The question was --

11            MR. CLARKE:  Your Honor, may he finish what he

12   was saying about people asking other people to --

13            THE COURT:  Please don't interrupt the witness.

14   Let him finish his answer.

15            MR. CLARKE:  Can he finish his answer, Your

16   Honor?  Can he finish his answer?

17            THE WITNESS:  Well, signing affidavits is just a

18   legal strategy used by the prosecution and the defense.

19   It doesn't necessarily equal to a threat, sir.

20            BY MR. ZUCKER:

21       Q    All right.  There are other people though you

22   did agree that you had conversations and conspired to kill

23   if they refused to testify -- unless they refused to

24   testify.  Right?  We've already gotten that out.

25       A    Well, that's what you said.  I didn't agree to

CROSS-EXAMINATION OF STOKES

1    that we tried to kill anybody else, sir.

2        Q    That you had conversations agreeing,

3    conspiring -- you know what conspiring is.  It's

4    conspiracy.  Is that right?

5        A    Yes, sir, I do.

6        Q    Conspiracy means an agreement.  Right?

7        A    Yes, sir.

8        Q    And so there were conversations in which it was

9    agreed between you and others that people would be told if

10   they did not refuse to testify, they would be murdered?

11       A    I don't recall that.  But I do recall getting a

12   two-point enhancement because that's what the prosecution

13   said at the time.

14       Q    So did the prosecution lie on you?

15       A    Well, everything they said wasn't true.

16       Q    Had they lied about that?

17       A    I just think that somebody gave them

18   misinformation as far as the witnesses.

19       Q    So people gave them false information and they

20   used that against you?

21       A    Well, I would think so.

22       Q    That happens, doesn't it?

23       A    I mean I can't say about -- I can only speak for

24   my case.

25       Q    Well, that's certainly what you are doing here

CROSS-EXAMINATION OF STOKES

1      today, isn't it, sir?

2          A     Doing what?

3          Q     Giving false information against Mr. Morales to

4      benefit yourself.

5          A     No, sir.

6          Q     So everything you are saying here today is the

7      truth?

8          A     And nothing but.

9          Q     And you've told us you're testifying here today

10     in the hopes of getting a Rule 35(b) motion.  Is that

11     correct?

12         A     In hopes.  Yes, sir.

13         Q     And a 35(b) motion is a motion, a potential

14     motion that can be filed by the prosecution to reduce your

15     sentence.  Right?

16         A     Yes, sir.

17         Q     And they don't get to reduce it.  All they can

18     do is ask the judge to reduce it.  Right?

19         A     Yes, sir.

20         Q     And the defense can't file a Rule 35(b) motion,

21     can they?

22         A     I'm not that advanced on the law, but I would

23     believe not.

24         Q     And you said that a 35(b) motion is based on

25     your telling the truth.  Right?

1      A    Yes, sir.

2      Q    You have to tell the truth.  Right?

3      A    Yes, sir.

4      Q    Although that's certainly not what you were

5  trying to get done in your own trial in 1999, was it?

6      A    What?  To get the truth to come out?

7      Q    Yes.

8      A    I just asked for them to sign affidavits to tell

9  the truth.

10     Q    You've already acknowledged that you got an

11 upward adjustment for perjury.

12     A    Because the judge came to his own conclusion,

13 sir.

14     Q    Well, was the judge's conclusion erroneous or

15 had you in fact attempted to suborn perjury with Holly

16 Brown?

17          MR. CLARKE:  Objection.

18          THE COURT:  All right.  Sustained.  We have

19 already gone through this, Mr. Zucker.

20 BY MR. ZUCKER

21     Q    And the Rule 35(b) motion has to be based on the

22 truth, but it also has to be based upon your providing

23 substantial assistance in investigating or prosecuting

24 another person.  Isn't that correct?

25     A    Yes, sir.

CROSS-EXAMINATION OF STOKES

1    Q    So what does it mean to substantially assist in

2    the prosecution of another person?

3    A    Well, I can tell you what assistance mean.  It

4    means to give help.  What is considered substantial is I

5    guess on the perception of whoever it may be.

6    Q    I see.  Okay.  Well, the purpose of a

7    prosecution is to convict somebody of a crime they've

8    committed.  Correct?

9    A    Yes, sir.

10   Q    So to provide substantial assistance in a

11   prosecution, it means basically helping to provide

12   assistance in getting somebody convicted of another crime.

13   Isn't that correct?

14   A    That sounds about right.

15   Q    Okay.  So the only way for you to get out of

16   serving the rest of your life in prison is to provide

17   substantial assistance in convicting somebody else.

18   Correct?

19   A    Yes, sir.

20   Q    The only way for you to get out is to put

21   somebody else in.  Right?

22   A    Just come tell the truth.  Whether they get

23   convicted, that's not on me.  That's for the judge and the

24   jury.  My job is just come tell the truth, sir.

25   Q    Yes.  But it's a truth that has to substantially

56

CROSS-EXAMINATION OF STOKES

1    assist in the prosecution of another person.  Correct?

2              MR. CLARKE:  Objection, Your Honor.

3              THE COURT:  This has already been asked and

4    answered.  Move on.

5              BY MR. ZUCKER:

6        Q    So if you come and tell the truth and that truth

7    does not accuse somebody else of another crime, you don't

8    stand to get a 35(b), do you?

9              MR. CLARKE:  Objection.

10             THE COURT:  Sustained.  Don't answer the

11   question.

12             BY MR. ZUCKER:

13       Q    Now you agree you didn't know Mr. Morales on the

14   street.  Right?

15       A    No, sir.

16       Q    You certainly weren't friends.  Right?

17       A    Not on the street.  No, sir.

18       Q    And you only met him in prison.  Correct?

19       A    Yes, sir.

20             THE COURT:  Mr. Zucker, this has all been

21   covered on direct.  Let's get something new.

22             MR. ZUCKER:  It's a predicate.

23             THE COURT:  All right.

24             BY MR. ZUCKER:

25       Q    In prison people are generally concerned about

1    talking in front of other people and providing information

2    that can be used against them.  Isn't that a fair

3    statement?

4         A    Sometimes.

5         Q    Well, you certainly are.  Right?

6         A    Well, you can't compare me to anyone else.  I'm

7    me.

8         Q    Okay.  You certainly would not openly talk about

9    crimes you've committed or can be prosecuted in front of

10   other prisoners, would you?

11        A    Well, I was young one time and I've done that

12   and it worked against me in my own case.

13        Q    And you've learned from that.  Right?

14        A    To a degree, sir.  Yes.

15        Q    And that's why you won't do it again.  Right?

16        A    You're right.

17        Q    Okay.  And generally -- well, you know what it

18   means to jump somebody's case.  Right?

19        A    Yes, sir.

20        Q    To jump someone's case is to get information

21   about them and their cases or case and use it against them

22   as you are using it against Mr. Morales here today.

23   Right?

24        A    I just used what he told me.

25        Q    But that's what it means to jump someone's case.

1    To get information from them and use it against them.

2    Right?

3         A    If you say so.

4         Q    Well, isn't that what it is?  You have been

5    locked up 16 years.

6         A    Right.

7         Q    That's what it is to jump a case.

8              MR. CLARKE:  Objection.

9              THE COURT:  All right.  Sustained.  Don't argue

10   with the witness.  Ask him questions.

11   BY MR. ZUCKER

12        Q    And in jumping someone's case, you can use

13   information they give them.  Correct?

14        A    Repeat the last part.

15        Q    Yeah.  To jump someone's case could be based on

16   information the person gives you.  Right?

17        A    Yes.

18        Q    Or could be based on some other source that you

19   attribute to them.  Correct?

20        A    Maybe in another case.  Not in this one.

21        Q    That's not what you're doing.  But you

22   acknowledge that is something that could occur.

23             MR. CLARKE:  Objection, Your Honor.  He has

24   answered that he is not jumping anybody's case.

25             THE COURT:  All right.  Sustained.

CROSS-EXAMINATION OF STOKES

1    BY MR. ZUCKER

2        Q    Before we get into that, sir, you also know what

3    it means -- well, first off, it's now public knowledge

4    that you've testified against Mr. Morales and were a

5    witness against him.  Correct?

6        A    When you say public knowledge, do you mean to --

7    like is it on the Internet or do people that's out in the

8    world free like you guys or do you mean in the penal

9    system?

10       Q    How about all three?

11       A    As far as the media, I don't know.  I haven't

12   heard anything.  But as far as in the penal system, well,

13   I guess guys would know because when I went back to

14   Allenwood, they were ready to jump on me because Mr.

15   Morales left word for them to assault me.  So that's why I

16   left.

17       Q    So people in prison, it puts you in a difficult

18   position once it's known that you're hot.  Is that a fair

19   statement?

20       A    Yes.  That's what happened at Allenwood.

21       Q    And basically, when you've testified against

22   somebody, you're labeled a snitch or a rat in the prison

23   system, aren't you, sir?

24       A    Yes, sir.

25       Q    And that changes your status among inmates.

```
 1        Isn't that correct, sir?

 2        A    Yes, sir.

 3        Q    And I mean basically living with a bone on you.

 4   Right?

 5        A    Yes, sir.

 6        Q    Could you explain to the jury what it means to

 7   live with a bone on you?  I mean that's a prison slang,

 8   isn't it, sir?

 9        A    Well, a bone I guess is if somebody puts a bone

10   on you, it could be a lie or a rumor or just a statement

11   that will be more than likely carried around with you.

12        Q    It's a bad word, a blemish on your reputation.

13   Right?

14        A    Yes.

15        Q    And right now you have the blemish on your

16   reputation that you've testified against another inmate.

17   Right?

18        A    Yes.  Right now, I'm currently in a secure area

19   of the jail.  They had to move me twice within 24 hours

20   because Mr. Morales tried to have me assaulted once again.

21        Q    Well, did I ask you that question, sir?

22        A    I thought you meant, you know, being as though I

23   have a bone and how it was affecting me in jail.  So I

24   thought you should know that.

25        Q    And having a bone on you affects how you live in
```

1    prison for the rest of your life.  Right?

2        A    Like I said, yes.  I'm constantly being

3    threatened with assaults because of Mr. Morales.  Yes.

4        Q    Well, did Mr. Morales ever threaten you?

5        A    No.  Not directly.

6        Q    And so other people are now saying I'm going to

7    get you because Morales told me to?

8        A    Well, Captain Richardson Chance who's in charge

9    of Intel --

10       Q    Please answer the question I asked you.  Is that

11   something -- I mean you are attributing -- you're telling

12   us other inmates are hostile to you.  Right?

13       A    I'm telling you the captain came and she through

14   her Intel she said Mr. Morales --

15       Q    You are not allowed to say what other people

16   told you.

17       A    Oh, I'm sorry.  Okay.

18       Q    All right.  That's all I'm trying to establish.

19       A    Okay.

20       Q    Nobody has come to you and said Jose Morales has

21   told me to attack you, have they?

22            THE COURT:  Well, wait a minute.  You just

23   didn't want him to answer the question.  If that's the

24   question you want him to answer, answer the question.  If

25   want hearsay, you'll get hearsay.

CROSS - EXAMINATION OF STOKES

1          BY MR. ZUCKER:

2      Q    Did any inmate say to you this is from Jose

3   Morales or anything like that?

4      A    No, sir.

5      Q    Now as a result of your testifying here today,

6   it's going to change the way you have to live in prison,

7   isn't it, sir, where you can stay, who you can be with,

8   how you are going to be guarded from other inmates.

9   Right?

10     A    It already has.  Even prior to me testifying,

11  sir.

12     Q    All right.  And life, the last 16 years in

13  prison certainly hasn't been comfortable, has it?

14     A    No.  I'm in prison.

15     Q    You don't like it, do you?

16     A    No.

17     Q    And you know it's going to get more

18  uncomfortable unless you get out, correct, because now

19  you're living with a bone on you.  Right?

20     A    It's worth it.

21     Q    It's worth it if you get out.

22     A    Well, just to -- I've changed.  And just to do

23  the right thing is worth it.

24     Q    Oh, you've changed and now you're here to do the

25  right thing?

CROSS-EXAMINATION OF STOKES

```
1        A     Yes, sir.

2        Q     And the right thing is not killing people, is

3    it?

4        A     Absolutely not.

5        Q     The right thing is not asking for vengeance, is

6    it, sir?

7        A     Absolutely not.

8        Q     Who's Akeem or who was Akeem?

9        A     My little cousin.

10       Q     Did you love him?

11       A     Yes.

12       Q     He was very close to you, wasn't he?

13       A     Yes.

14       Q     And he's deceased now.  Right?

15       A     Yes.  He was murdered June the 4th.

16       Q     And that bothered you, did it not?

17       A     Yes.

18       Q     And you've expressed how that's bothered you on

19   the Internet, haven't you, sir, on your Facebook page?

20       A     Yes.

21       Q     You've told people -- well, on June 14th, on

22   your Facebook page, you posted "little cuz, you were the

23   best man, fuck all of you that were trying to slander my

24   little cuz good name.  He was no rat.  When you find that

25   out, the truth, you will feel stupid."  That was part of
```

1    your post.  Right?

2        A    Yes.

3        Q    "It's not a matter of if --"

4             MR. CLARKE:  Objection, Your Honor.  Can he ask

5    him a question?

6             THE COURT:  Let him answer your question, Mr.

7    Zucker.  Don't interrupt him.

8             MR. CLARKE:  Unless he wants to be sworn in and

9    testify, Your Honor.  Otherwise, he can ask him the

10   questions, please.

11            THE COURT:  Ask him a question.

12            MR. ZUCKER:  Okay.

13            BY MR. ZUCKER:

14       Q    And the statement immediately after on that post

15   was --

16            MR. CLARKE:  Objection.

17            THE COURT:  Ask him a question.  Don't read --

18            BY MR. ZUCKER:

19       Q    Did you not post the following?  "It's not a

20   matter of but" -- I'm sorry.  "It's not a matter of if,

21   but only when we find your sucker ass, please believe

22   me."

23            MR. CLARKE:  Objection.

24            BY MR. ZUCKER:

25       Q    "I wish all types of pain and destruction on

CROSS-EXAMINATION OF STOKES

```
 1    you, your family and friends.  Fuck you.  Die slow."
 2    We'll stop right there.
 3              THE COURT:  What relevance is this?
 4              BY MR. ZUCKER:
 5         Q    What --
 6              THE COURT:  Mr. Zucker, I'm talking.  Okay.
 7    Don't talk when I'm talking.
 8              MR. ZUCKER:  Very well.
 9              THE COURT:  What relevance is of what he posts
10    about somebody who murdered his cousin?  I would be
11    unhappy if my cousin were murdered.  What relevance is it?
12              BY MR. ZUCKER:
13         Q    Sir, you just told us that you've turned over a
14    new life, you no longer seek vengeance, you no longer
15    believe in violence.  But on the Internet, you're
16    expressing the intent, your family and friends, fuck you,
17    die slow.  Right?
18         A    Yes.
19         Q    "Laugh now.  But cry later."  Right?
20         A    Yes.
21              MR. CLARKE:  Objection.
22              BY MR. ZUCKER:
23         Q    You're expressing --
24              THE COURT:  What -- will you please?  There's an
25    objection.  All right.  Come to the bench.
```

1          MR. ZUCKER:  I think I can --

2          THE COURT:  Come to the bench.

3          (Bench conference:)

4          THE COURT:  Is this the posting exhibit?

5          MR. ZUCKER:  The June 14 posting, judge.

6          THE COURT:  Why are we going into this?

7          MR. ZUCKER:  Because he's claiming that he's

8   turned over a leaf and he is no longer -- he just said

9   he's no longer seeking vengeance.

10          THE COURT:  He just said about his cousin being

11   murdered and he hopes the people who did it have a slow

12   death.  So what?

13          MR. ZUCKER:  It expresses an intent to seek

14   revenge I believe.  It's not a matter of if, but if only

15   when we find you.

16          MR. CLARKE:  That's argument, Your Honor.  He's

17   asked him the question.  Now if we can just move on?  I'm

18   going to come back and ask on redirect if he ever

19   threatened you and I think that should be the end of it.

20          MR. ZUCKER:  I think we need to bring out the

21   implication of that it's not a matter of if, but only when

22   we find you.

23          MR. CLARKE:  If that's not --

24          THE COURT:  Which posting?

25          MR. ZUCKER:  In the middle.

CROSS-EXAMINATION OF STOKES

```
1              THE COURT:  There are two postings for June 14.
2              MR. ZUCKER:  The top one.  The top one.  It's
3    not a matter of if, but only --
4              THE COURT:  I can read it.  I can read it.
5              MR. ZUCKER:  Reading it into the record.  And
6    directly underneath that, I ask to examine him on the if.
7    That clearly shows an intent to get him.
8              MR. CLARKE:  I haven't read the full thing.  If
9    it says that, if it says if, then he can ask him the
10   question.  But please don't read it to him.  Just ask him.
11   And then approach him and say does this refresh your
12   memory --
13             THE COURT:  You have already read this to him
14   once.  I'm not going to have it read again.  I'm not going
15   to have this kind of evidence -- ask him did he intend to
16   do violence to the person.  You can ask him that.
17             MR. ZUCKER:  Can I focus in on that one
18   sentence, if?
19             THE COURT:  You already read the sentence to
20   him.  Did you intend by that sentence to mean that you
21   intended to do physical violence to the person?  You can
22   ask that.  Okay.
23             (In open court:)
24             BY MR. ZUCKER:
25        Q    Sir, you expressed in this posting an intent to
```

68

1      find and do violence to whoever it was in relation to

2      whoever did harm to your cousin.  Isn't that a fair

3      statement?

4           A    No, sir.

5           Q    Well, what does the statement -- it's not a

6      question --

7                MR. CLARKE:  Objection.

8                MR. ZUCKER:  I'd ask for a clarification what he

9      means --

10               THE COURT:  Well, you've already read the

11     statement to him and he says he did not mean violence by

12     it.  Ask him another question.

13     BY MR. ZUCKER

14          Q    Well, you expressed an intention to find the

15     sucker ass, didn't you, sir?

16          A    Yes, sir.

17          Q    Is that your exact words?

18          A    Yes, sir.

19          Q    And so when you found the sucker ass, what was

20     your intention?

21          A    Oh, I thought you weren't finished.  Well, by

22     that time, like I said, sir, my cousin was murdered June

23     the 4th, I had already talked to people from the D.E.A.

24     and let them know what was going on with my cousin because

25     he had just came home from federal prison and somebody

CROSS-EXAMINATION OF STOKES

1   lied and said he was a snitch.  So I already -- the

2   agents, I made them aware of what was going on and who I

3   thought was involved directly and that's what I meant

4   by -- and they said they were on top of it.  So that's

5   what I meant by it's just a matter of time.

6        Q    So it's a matter -- so you included the D.E.A.

7   agents in this statement when we find your sucker ass?

8             MR. CLARKE:  Objection.  Argumentative.

9             THE COURT:  Sustained.  Don't argue with the

10  witness.

11  BY MR. ZUCKER

12       Q    Well, who did you mean when you said when we

13  find, the rest of it?

14       A    Meaning the government, the police and the

15  D.E.A. agents.

16       Q    Okay.  You said we though, not them.  Right?

17       A    I felt like I was a part of it by me expressing

18  it and they expressed their willingness to help me.

19       Q    I see.  And it certainly -- pain and destruction

20  on you, your family --

21            MR. CLARKE:  Objection.

22            THE COURT:  All right.  Sustained.  We have

23  already gone through -- you've already read it to him and

24  you've already asked him about it.  Move on to another

25  subject.

CROSS-EXAMINATION OF STOKES

```
1    BY MR. ZUCKER

2       Q    I guess the question is and I hope I don't step

3    afoul of the Court's ruling.  But you've said you

4    interpreted it as just D.E.A. getting the person who you

5    believe killed your cousin.  Right?

6              MR. CLARKE:  Objection.

7              THE COURT:  Sustained.  Sustained.  You have

8    already inquired about this.

9              BY MR. ZUCKER:

10      Q    Well, there was a reference to their family and

11   friends as well, wasn't there, sir?

12             MR. CLARKE:  Objection.

13             THE COURT:  Sustained.

14   BY MR. ZUCKER

15      Q    Now you said yesterday that Mr. Morales told you

16   Needleman provided the name, Rob Long, as a cooperator,

17   but played no role in either the drugs or the murder.  Is

18   that correct?

19      A    He never mentioned the last name, sir.  He

20   didn't say Mr. Long to me.  Mr. Morales.

21      Q    Okay.  I'm asking now about Mr. Needleman.  You

22   told us yesterday that when you spoke with Morales, he

23   said Needleman provided the information about the

24   co-defendant, Rob Long, who was cooperating.  Right?

25      A    Yes.
```

1    Q    But you claimed that Morales never told you that

2    Needleman played any role in either the murder or the

3    drugs.  Is that correct?

4    A    No.  He didn't say he murdered the guy.  I mean

5    I don't know what role you mean.  Like he didn't say he

6    was involved in the actual murder.  He just notified him

7    of who was testifying against him and that guy eventually

8    was murdered.

9    Q    I see.  So he had nothing to do with the murder?

10   That was his testimony?

11              MR. CLARKE:  Objection.

12              BY MR. ZUCKER:

13   Q    I mean not his testimony, his prior statement.

14              THE COURT:  Wait a minute.  What's the

15   objection?

16              MR. CLARKE:  He's already answered that he

17   didn't have a role.  He never said that Stanley Needleman

18   had a role in the murder, a direct role in the murder and

19   Stanley Needleman provided information to Mr. Morales

20   about Mr. Rob or Ron's cooperation.  That's the current

21   state of the record.

22              THE COURT:  Rephrase the question.  That's not

23   an appropriate question the way you phrased it.

24              MR. ZUCKER:  Okay.

25              BY MR. ZUCKER:

1      Q    Mr. Clarke accurately summarized your testimony

2  yesterday, isn't it, sir, that Mr. Needleman provided some

3  information, but played no role.  Had nothing to do with

4  either the murder nor the drugs.

5             MR. CLARKE:  Objection.  He's saying --

6             MR. ZUCKER:  Isn't that -- I thought I just said

7  what Mr. Clarke had said.

8             THE COURT:  I don't think that's what Mr. Clarke

9  summarized it as.

10             BY MR. ZUCKER:

11      Q    Why don't you clarify for us, sir, what you

12  meant yesterday when you said Mr. Needleman provided the

13  information, but had nothing to do with the murder nor the

14  drugs?

15      A    Okay.  In reference to Mr. Ron or Rob, Mr.

16  Morales just told me that Mr. Needleman let him know that

17  Ron had agreed to testify against him in the heavy

18  machinery case that was pending at the time against Mr.

19  Morales.

20      Q    But nothing about the murder.  Mr. Needleman

21  played nothing about that.  Right?

22      A    No, sir.  He just gave me information of who

23  was --

24      Q    But when you spoke with the D.E.A. back in July

25  of 2012, you told them that Morales had told you that he

1    and his attorney had a guy named Rob Long killed.  Isn't

2    that correct, sir?

3         A    No, sir.

4         Q    And you told him that Needleman -- well, you

5    made reference to Needleman and Mr. Morales actually

6    arranging for two murders, didn't you, sir?

7         A    I don't recall referencing them, Mr. Morales and

8    Mr. Needleman, arranging for two murders.

9         Q    And you also told the D.E.A. that Mr. Needleman

10   got a cut of everything Mr. Morales did referring to the

11   drugs.  Isn't that correct, sir?

12        A    Well, that's what Mr. Morales told me.

13        Q    That Mr. Needleman got a cut of the drugs as

14   well?

15        A    He said he was involved in everything.  He had

16   got a cut.  Yes, sir.

17        Q    So Needleman was involved in the drugs and

18   Needleman had put up the money for the drugs.  Isn't that

19   correct?

20        A    I don't know that.

21        Q    But they were partners in the drug business?

22        A    That's what Mr. Morales said.

23        Q    But well, you deny that telling the agents that

24   Needleman was a participant in the murders as well?

25        A    Excuse me?

CROSS-EXAMINATION OF STOKES

1    Q    You deny today saying that Needleman was a
2    participant in this murder and another murder along with
3    Mr. Morales?  That never happened?  You never said that?
4    A    No, sir.  Not that I recall.
5    Q    All right.  Would it refresh your recollection
6    on that point to look at the D.E.A. agent's report
7    prepared as a result of your -- prepared in reference to
8    your conversations?
9         MR. CLARKE:  Objection.  He has no memory of
10   that, Your Honor.
11        THE COURT:  He has no memory of it.
12        BY MR. ZUCKER:
13   Q    You're saying you have no memory of it.  Would
14   it refresh your memory if you looked at the agent's
15   report?
16   A    I mean I'll give it a try, sir.
17   Q    Okay.  Defendant's 12 marked for identification.
18   Take a look at this and let me just try to move it along a
19   little faster.  I'm asking you to look at -- for the
20   benefit of counsel, it's MS-45 and 46.  If you take a look
21   at the first line of paragraph 5 in that and then -- well,
22   paragraph 6 and I highlighted the portion in the middle.
23   A    What I think here what I see is not actually all
24   my words.  I think maybe that's just the way that they are
25   writing it.  It's just maybe the agent's way of writing

1    it.  I don't recall Mr. Morales saying that Mr. Needleman

2    had anything to do with any of the murders.  He just --

3    once I said again he just provided information as far as

4    who was going to testify against him.

5        Q   So having looked at that document, it doesn't

6    refresh your recollection.  You still deny having made

7    that statement on July 30, 2012.  Is that a fair

8    assessment?

9        A   Yes.  It's the particular question that you're

10   asking me about about Mr. Needleman being involved in two

11   murders, I don't recall that part.

12       Q   What about being involved in the drugs?

13       A   That's what Mr. Morales said.

14       Q   Okay.  Thank you.  Now --

15       THE COURT:  These exhibits you just showed him

16   are for identification only?

17       MR. ZUCKER:  At this point, yes, judge.

18       THE COURT:  All right.

19       MR. ZUCKER:  Could I have a quick moment to

20   consult?

21       BY MR. ZUCKER:

22       Q   Now you told us that -- well, Mr. Morales

23   claimed to you that the man, Rob Long, was killed, that

24   first they tried to overdose him and then when that didn't

25   work, they shot him.  Right?

```
 1          A     Yes, sir.

 2          Q     And you claimed quite a bit of information that

 3     he provided to you.  Isn't that correct?

 4          A     Yes, sir.

 5          Q     First, you said it was 13 days later.  Correct?

 6     13 days after the proffer?

 7          A     Something like that, yes.

 8          Q     And it was shot once in the back of the head,

 9     once in the face.  Correct?

10          A     Yes.

11          Q     That he said --

12                MR. ZUCKER:  Court's indulgence.

13                (Pause.)

14                BY MR. ZUCKER:

15          Q     Troy was seen with or Troy was with Rob Long

16     that morning, right, when the murder occurred.  Right?

17          A     Was he with him that morning?

18          Q     Yeah.  The morning of the murder.  They were

19     together.  Right?

20          A     I would guess so if I remember right.  Yes.

21          Q     And they both had drug problems.  Right?

22          A     I don't know if Troy had a drug problem.  I

23     don't recall if Troy had a drug problem or not.

24          Q     The information about the 13 days and the

25     caliber and being shot in the front and back of the head,
```

CROSS-EXAMINATION OF STOKES

1    that was all in the newspaper, wasn't it, sir?

2        A    I never saw the newspaper article and I don't

3    know anything about the caliber of the weapon, sir.

4        Q    You never saw -- well, you certainly -- you had

5    magazines that you sent to your family.  Right?

6        A    Yes.

7        Q    You certainly have access to publications.

8    Isn't that correct, sir?

9        A    Whatever was in the jail.

10       Q    Well, you had limited access to the Internet as

11   well, didn't you, sir?

12       A    No Internet access.

13       Q    Well, you have Core Links.  Right?

14       A    Yes.

15       Q    Okay.  And you were able to post on Facebook.

16   Right?

17       A    But that's not Internet access.  You can't

18   directly post on Facebook.  I have to go through a third

19   party.  Like I can't get directly on any Internet access

20   in prison.

21       Q    You have to go through a third party?

22       A    Yeah.  Like I can get my daughter, I can tell

23   her what to write and she can put it on and she can come

24   back and stuff like that.  But no direct Internet access

25   is provided to inmates in the federal B.O.P.

CROSS-EXAMINATION OF STOKES

1    Q    Well, certainly people from -- you hung with Mr.

2  Morales and became friends with him because he was from

3  Baltimore.  Right?

4    A    Yes, sir.

5    Q    Even though you guys didn't know each other in

6  Baltimore.  Right?

7    A    Yes, sir.

8    Q    You were from other neighborhoods.  Right?

9    A    Yes, sir.

10   Q    And you said you met him because he was hanging

11 with some Baltimore guys in the yard.  Right?

12   A    Yes, sir.

13   Q    And guys in prison hang frequently with their

14 homeboys.  Right?

15   A    Yes, sir.

16   Q    Okay.  So you were hanging with other Baltimore

17 guys.  Right?

18   A    Yes, sir.

19   Q    And Baltimore guys were talking about what was

20 going on in Baltimore.  Right?

21   A    We often do.

22   Q    Okay.  And they have access -- people like to

23 get papers from home, don't they, sir?

24   A    Nobody at the time I think was getting a

25 Baltimore paper.

1    Q    So of all the inmates in this bureau, there were
2    about 12 or 13 of you in the yard together when you met
3    Mr. Morales.  Right?
4    A    That sounds about correct.
5    Q    And those weren't all the guys from Baltimore.
6    Right?
7    A    No, sir.
8    Q    But somehow you know -- how many more guys were
9    from Baltimore?
10   A    There were a few.
11   Q    Are we saying in the neighborhood of 40, 50?
12   A    No.  Nowhere near that amount.
13   Q    Thirty?
14   A    I wouldn't even say 30.  Maybe in the high
15   teens, early 20's.
16   Q    Okay.  And somehow you know that five years ago
17   when you were there, none of the inmates had Baltimore
18   newspapers coming to them.  That's what you're telling
19   this jury --
20        MR. CLARKE:  Objection.
21        THE COURT:  Sustained.  Please, ask him a
22   question.  All right.
23        BY MR. ZUCKER:
24   Q    Wasn't that your testimony a moment ago, sir?
25   That nobody was getting Baltimore papers then.

1    A    Your first question you asked me do I remember

2  five years ago that nobody there was getting -- I was just

3  there approximately one year ago and none of the guys on

4  the yard that I recall were getting the paper.  They never

5  gave it to me.  But in the library every so often, every

6  so often in the library, there would be a Baltimore paper.

7  Maybe not a Baltimore -- maybe like a City Paper or

8  something like that.

9    Q    Well, they got the Baltimore Sun delivered to

10  the Allenwood library, didn't they, sir?

11    A    Like I said, I don't remember what paper it was.

12  I thought it was the City Paper or something --

13    Q    So the City Paper came --

14    A    I think it was.  I'm not really sure.

15    Q    I see.  And you're telling us -- you told us

16  yesterday that you did go to the library.  Right?

17    A    I went a few times.  Yes.

18    Q    Well, you're obviously an articulate,

19  intelligent, well-read person.

20    A    Thank you, sir.

21    Q    That's a fair statement.  Right?

22    A    I would think so.

23    Q    You won't quarrel with me on that one, huh?

24    A    Absolutely not.

25    Q    Okay.  Okay.  And guys in prison, frequently

CROSS-EXAMINATION OF STOKES

1  intelligent people, I mean one of the best ways to pass

2  the time is reading.  Right?

3       A    I would agree.

4       Q    Okay.  And in addition to reading, I think you

5  also do some writing, don't you, sir?

6       A    Yes, sir.

7       Q    I think you've written screen plays or drafts of

8  novels, things like that?

9       A    Movies, reality T.V. shows, game shows.

10      Q    You've written all that.  Right?

11      A    Yes, sir.

12      Q    Because you have a good imagination?

13      A    Good one.  I mean if that's what it takes to

14  write movies and reality T.V. shows, I'd have to agree.

15      Q    You're creative, intelligent?

16      A    I would have to agree.

17      Q    And you are good at making things up.  Right?

18      A    If that's my area of expertise and that's what

19  it takes, then yes, sir.

20      Q    Okay.  And you went to the library.  You're from

21  Baltimore and people talk about Baltimore stuff.  Right?

22      A    Yes, sir.

23      Q    And you just told us the Baltimore City Paper

24  was delivered there.  You think it was the City Paper.

25  Right?

1        A    Like I said, I know there was a paper that came.

2    I'm not sure what title it was.

3        Q    I see.  And you can tell us that five years ago,

4    you didn't read the Baltimore City Paper even though you

5    were from Baltimore and were in the library.  Right?

6        A    Yes.  I could tell you five years ago at

7    Allenwood, I wasn't there five years ago.  I was only

8    there within the last year or so.

9        Q    Well --

10       A    2012.  That wasn't five years ago.

11       Q    I take it back.  It wasn't 2012.  Whenever you

12   were in Allenwood and went to the library, did you ever

13   read the Baltimore City Paper?

14       A    Whichever paper it was, yes.  Once or twice, I

15   have.  Yes.

16       Q    And you are aware, sir, that many of the facts

17   you've recounted and attributed to Mr. Morales were

18   actually in the Baltimore City Paper?

19            MR. CLARKE:  Objection.

20            THE COURT:  Sustained.

21   BY MR. ZUCKER

22       Q    Are you familiar with articles about Mr. Morales

23   in the Baltimore City Paper?

24       A    I never read any from Allenwood.  So no.

25       Q    Okay.  You read them somewhere else?

CROSS-EXAMINATION OF STOKES

```
1        A     Long time after this case.

2        Q     Long time after you testified, huh?

3        A     No.  Not after testifying.  I am testifying now.

4   I said after this case.  After I got involved with the

5   D.E.A. and my family and friends were kind of scared of

6   Mr. Morales and they told me some things.  But it was

7   after that I talked to Mr. Marty and came down here to the

8   grand jury.  It was after that.

9        Q     So you came down in 2012.  It was only after

10  that that you supposedly learned -- much of what you've

11  testified to was actually in the Baltimore City Paper.

12  Isn't that correct?  You found out afterwards?

13       A     Some of it.

14       Q     So this isn't a question of you just finding out

15  information and attributing it to Mr. Morales.  It's not a

16  question of jumping this case based on --

17            MR. CLARKE:  Objection.

18            THE COURT:  Sustained.  Don't argue with him.

19  Ask him a question.

20            BY MR. ZUCKER:

21       Q     That's not what's going on here, is it, sir?

22            MR. CLARKE:  Objection.

23            THE COURT:  Sustained.  Don't answer the

24  question.

25
```

CROSS-EXAMINATION OF STOKES

BY MR. ZUCKER

Q    Now you made reference to some letters you sent to some of the agents after you had been debriefed. Isn't that correct, sir?

A    Yes, sir.

Q    Were you truthful in those letters?

A    I tried to be as much as possible, sir. Yes, sir.

MR. ZUCKER: Court's indulgence.

(Pause.)

BY MR. ZUCKER:

Q    And of course, you spoke with Agent Lam or O'Keefe I think on July 30, 2012. Isn't that correct, sir?

A    That sounds about right.

Q    And then you wrote him some letters clarifying afterwards additional information you obtained. Isn't that correct, sir?

A    Yes, sir.

Q    MS-126. Showing you what's been marked as Defense Exhibit 13. This is in fact one of those letters you wrote to Mr. Lam on August 26, 2012, isn't it, sir, a fair and accurate copy of that letter?

A    Yes, sir.

Q    And in that letter, you clarify what Mr. Morales

1    had said to you or at least you claim to.  Isn't that

2    correct, sir?

3         A    Do you want me to read the whole thing or are

4    you asking about a specific part?

5         Q    Well, I'm asking you right now, do you agree

6    that when you wrote to Mr. Lam, you were truthful.  Right?

7         A    Yes.

8         Q    And you wrote a letter to Mr. Lam clarifying you

9    claimed in that letter what Mr. Morales had actually told

10   you.  Isn't that correct?

11        A    Yes, sir.

12        Q    And in that letter, you claim that you were

13   confused.  Mr. Morales never said the person was actually

14   shot, did he?

15        A    I'm trying to get to --

16        Q    Long --

17             MR. CLARKE:  I'm sorry.  Is there a question,

18   Your Honor, there?

19             THE COURT:  Ask him a question.

20             MR. ZUCKER:  I'll withdraw that and ask another

21   one.

22   BY MR. ZUCKER

23        Q    All right.  You wrote to Mr. Lam and you said

24   the following statement.  You can follow along with me.

25             MR. ZUCKER:  Do you have it, counsel?

```
 1              MR. CLARKE:  I do.

 2              BY MR. ZUCKER:

 3         Q    You greeted him by saying, how is everything

 4    going and you give today's date and then you say Jose

 5    Morales told me --

 6              MR. CLARKE:  Objection, Your Honor.  Is there a

 7    question?

 8              BY MR. ZUCKER:

 9         Q    Did you make the following statement?

10              THE COURT:  Well, ask him a question.  Okay.

11    BY MR. ZUCKER

12         Q    Jose Morales told me --

13              MR. CLARKE:  May we approach, Your Honor?

14              THE COURT:  Come to the bench.

15              (Bench conference:)

16              THE COURT:  Let me see the letter.

17              MR. ZUCKER:  Sure.

18              MR. CLARKE:  I have no problem asking him if he

19    recalls what he said to Trooper Lam --

20              MR. ZUCKER:  Excuse me.  You got the wrong

21    letter.

22              MR. CLARKE:  Can I see that one?  No, it's not a

23    problem.  What I don't want is a repeat of what's been

24    happening pretty much throughout the whole trial where

25    defense counsel sits there and reads and just doesn't care
```

1    what the answer is and just says isn't it true that you

2    said this.  No matter what he says, he goes onto the next

3    sentence, isn't it true you said this.  All I'm asking is

4    that he ask a question and then ask him if he recalls

5    saying something about that subject.  Do you recall and

6    then ask him.  Do you recall saying something about

7    popping somebody's head?

8              And let me tell you where we're going to go with

9    this.  That, Your Honor, and Mr. Zucker, I don't know if

10   he's aware of it or not and I can understand why he has a

11   misunderstanding of that letter.  But the head popping and

12   the hot shot is not as to Mr. Long.  We read it the first

13   time and thought the same thing.  But when you re-read it

14   and realize that Junior died, Your Honor, Mr. Morales told

15   this witness that he had Junior's head popped.  And so

16   when he found out that when -- when Morales was describing

17   having Junior killed by hot shot by popping his head, he

18   said that's the same language that he used when he talked

19   about shooting Junior's brother, Clyde.  So this is very

20   dangerous territory because this is about Morales

21   admitting to a second murder to having Junior killed.

22             THE COURT:  We heard some of that yesterday.  It

23   came out yesterday.

24             MR. ZUCKER:  It's not true.  So I'm glad to go

25   there.

```
 1              MS. WILKINSON:  Not that he shot Junior.  That
 2     he died of a hot shot.
 3              THE COURT:  Don't just read the letter to him.
 4     Ask him about what he said.  This is in evidence now.
 5              MR. ZUCKER:  It hasn't been moved in yet.
 6              MR. CLARKE:  If counsel keeps essentially asking
 7     questions and --
 8              THE COURT:  It speaks for itself.  You don't
 9     have to read it to him.
10              MR. ZUCKER:  Well, I can ask him did you make
11     the following statement.
12              THE COURT:  Is this being offered into evidence
13     or not?
14              MR. ZUCKER:  It will be.  It probably has to
15     have some redactions, but yes.
16              MR. CLARKE:  What redactions?
17              THE COURT:  What redactions do you want to make?
18              MR. ZUCKER:  Well, as an accommodation to them,
19     we'll see as we get there.  Certain things I don't intend
20     to go over.  If they want it in its entirety for pretext,
21     that's fine.
22              THE COURT:  I don't know any basis to redact
23     this.  If this is the document that in fact is talking
24     about a second murder, I'm not sure you want to offer it.
25     If you don't want to offer it, then I don't think you
```

CROSS-EXAMINATION OF STOKES

```
1    should be walking around with excerpts --
2              MR. ZUCKER:  I definitely intend to offer it.
3              MR. CLARKE:  As long as the record is clear --
4              THE COURT:  As long as you know what comes with
5    it.  It's going to be painful.  It's up to you.
6              MR. ZUCKER:  I know.  It's coming in.  Thank
7    you.
8              THE COURT:  And don't just read it to him.  You
9    can ask him questions about it --
10             MR. ZUCKER:  I'll ask him didn't you make the
11   following statement.
12             THE COURT:  It's in evidence.  It's already in
13   evidence.  The jury can look at it.  Okay.
14             MR. CLARKE:  The question is for the record are
15   you moving this into evidence, sir?  If you are, you're
16   doing it at your risk because on redirect, I'm going to go
17   through line by line and establish that Mr. Morales
18   admitted to killing Junior as well on the same night.
19             THE COURT:  All right.  Okay.
20             (In open court:)
21   BY MR. ZUCKER
22        Q    Didn't you tell Agent Lam in this letter that
23   Morales told you he got the "killer" to give the "snitch"
24   a "hot shot".  Isn't that correct, sir?
25        A    Yes, sir.
```

1    Q    And then you went on to explain that every time

2  he mentioned getting the guy's head popped, you

3  erroneously assumed, he meant by way of a gun.  Isn't that

4  correct, sir?

5    A    Yes.  It's depending on which murder you're

6  talking about.

7    Q    Now this is in reference to another murder.

8  Isn't that true?

9    A    Well, I'm trying -- I need to see the --

10   Q    Go ahead.

11   A    Thank you.

12   Q    I'm just going to stand over your here.  Go

13  ahead.

14          (Pause.)

15          BY MR. ZUCKER:

16   Q    Have you had a chance to review it, sir?

17   A    To a degree.

18   Q    Do you need more time?  Take your time, sir.

19  Let us know when you're ready.

20   A    Ask me the question.

21   Q    You do agree that in that letter to Agent Lam

22  you said every time he would mention getting the guy's

23  head popped, I erroneously assumed that he meant by way of

24  a gun.  That's why I always referred to the killer as the

25  shooter.  Right?

1     A     That's in there.  Yes.

2     Q     Okay.  And who was that in reference to?

3     A     If I'm not mistaken, Troy Lucas.

4     Q     Okay.  Troy Lucas as Clyde -- I'm sorry.  You

5     said Troy Lucas, the shooter?

6     A     Yes.

7     Q     In reference to which murder?  Rob Long?  Right?

8     A     If I'm not mistaken, yes.

9     Q     Well, you believe this is in reference to Rob

10    Long.  So you were --

11    A     But I know it mentions the other murder Mr.

12    Morales was involved in as well.  So I was trying to --

13    Q     But this sentence talks -- the way you read it

14    in context, you believe it is in reference to Rob Long and

15    then you later go on to talk about another murder that Mr.

16    Morales supposedly committed.  Correct?

17    A     Yes, sir.

18    Q     And the other murder that you attributed to him,

19    that you said he claimed to have done was Troy's brother.

20    Right?

21    A     Yes.

22    Q     But this portion about I erroneously assumed it

23    was a shooting, not a hot shot was in reference to Rob

24    Long.  Right?  You've already told us that.

25    A     I think so.  Yes.

1    Q    So now your testimony yesterday that he had Rob

2    Long shot was in error as you told Agent Lam.  Right?

3    A    I don't think it was totally in error as the

4    evidence probably have shown.  But I just think that

5    during that letter, I just may have just mixed some things

6    up.

7    Q    I see.  But you do agree when you wrote to Agent

8    Lam, you were telling him you were confused about whether

9    or not Troy shot Rob Long.  In fact, Mr. Morales told you

10   that Rob Long was killed with a hot shot.  Right?

11   A    He tried to kill him with a hot shot.

12   Q    But tried or you said I erroneously assumed he

13   meant by way of a gun?

14   A    Um-hum.

15   Q    Right?  That's clearly stating that you're

16   claiming that it was by a gun was in error, isn't it, sir?

17   A    Yes.  When he said his head popped, it just

18   automatically think shots.

19   Q    So Morales told you Long was killed with a hot

20   shot, not a gun.  Right?

21   A    I said in that moment I may have wrote that.

22   But he also told me that he was shot.

23   Q    Well, you also in the grand jury --

24        MR. ZUCKER:  Moment to consult.

25        (Pause.)

93

```
 1              BY MR. ZUCKER:

 2       Q    So at least when you wrote to -- it's in

 3  evidence.  Why don't we just put it on the screen so the

 4  jury can see it at the same time?  Can you see that on the

 5  screen where you are, Mr. Stokes?

 6       A    Yes, sir.

 7       Q    All right.  "Jose told me that he got the killer

 8  to give the snitch a hot shot is the first line."  Right?

 9       A    Yes, sir.

10       Q    "Every time he would mention getting the guy's

11  head popped --"

12              MR. ZUCKER:  Maybe you can phase out a little.

13  Go back a little, Mr. Proctor.  Thank you.

14              BY MR. ZUCKER:

15       Q    And it looks like it's cut off there.  It says

16  "I and then it's underlined erroneously assumed that he

17  meant by way of gun.  That's why I always referred to the

18  killer as the shooter.  Today, he clearly stated it was

19  done by a hot shot."  Right?  And then he goes on to talk

20  about Mr. Needleman.  Right?  So it's pretty clear here as

21  you told us your testimony or your statement to Agent Lam

22  was it was by a hot shot, not by way of a gun.  Right?

23       A    Now, sir, if I can call your attention to the

24  line under that where it says -- after it says hot shot,

25  the shooter and hot shot?
```

1      Q    Yes, sir.

2      A    It says I'm talking about what Stanley Needleman

3  knew and what might and might not say to you guys.

4  Meaning to Mr. Lam and --

5      Q    Right.

6      A    Now that's not talking about Mr. Ron.  That's

7  talking about the guy that Mr. Morales -- the other guy.

8      Q    Well, the very next line is Morales was like I

9  swear that I hope this guy doesn't find out that I killed

10 his brother.  Right?

11     A    Yes.

12     Q    So that's talking about the shooter, Troy Lucas.

13 In the first portion, it's in reference to he's hoping

14 that Long doesn't find out -- I'm sorry -- not Long.

15 Lucas.  I'm getting the names confused.  That Troy Lucas

16 doesn't find out he supposedly also killed Clyde Lucas.

17 Right?  But it's in reference, the first paragraph is in

18 reference to the murder of Rob Long.  Right?

19     A    It seems that way.  It seems that way and it's

20 kind of confusing me right now.  But the other murder that

21 Mr. Morales -- that we're talking about here besides his

22 brother is the other guy that was on the stand.

23     Q    So now we have a third murder he's confessed to?

24 Right?

25     A    Should I continue?

1              MR. CLARKE:  May we approach, Your Honor?

2              THE COURT:  Come to the bench.

3              (Bench conference:)

4              MR. CLARKE:  Not that it could get any more

5     confusing, Your Honor, but he's been told not to talk

6     about the Demetrius Smith trial.  He has knowledge about

7     Mark Bartlett who testified at that trial, who also is

8     dead of a drug overdose.  And I think he's been told as

9     well that -- in fact I know he has by Mr. Morales, that

10    Mr. Morales was involved in having Mr. Bartlett killed as

11    well.

12             MS. WILKINSON:  There are three witnesses in the

13    case who died of drug overdoses, Your Honor, in that other

14    case.  Mark Bartlett, who was the main eyewitness in the

15    first trial, Clyde, who was the junkie brother of Troy

16    Lucas and Warren Lumpkin, who also died of a drug

17    overdose.

18             THE COURT:  Do you want to go there?

19             MR. ZUCKER:  Yes.  And I'm aware of it.  And I

20    don't know how you want to handle Mark Bartlett, that's

21    fine.  But Clyde didn't die of a drug overdose.  Clyde was

22    in the hospital for a week.  His niece already testified.

23    He was in the hospital --

24             MR. CLARKE:  What I don't want to see happen is

25    exactly what Mr. Zucker is trying to do, which is to try

1    and prove a trial outside of a trial.  What's not on trial

2    here is how Mr. Clyde Lucas died.  The question is what

3    was told about Clyde Lucas' death.  And it doesn't matter

4    whether he died a week later or not a week later.  Also I

5    think we can handle the matter of Mark Bartlett without

6    talking about Demetrius Smith.  Again, I don't want Mr.

7    Zucker to use the back door what he can't get in the front

8    door and bring up the fact that the guy --

9            THE COURT:  Stay away from Demetrius Smith.

10            MR. ZUCKER:  I'm fine with that.

11            MR. CLARKE:  That means staying away from Mark

12    Bartlett.

13            MR. ZUCKER:  Well, except he's brought it in.  I

14    haven't asked anything about Bartlett.

15            MR. CLARKE:  He just got finished saying, he's

16    raising his hand and flagging like we asked him to do,

17    Your Honor, that he's going to say the guy that was on the

18    stand in the state case got whacked.

19            MS. WILKINSON:  That's what Jose told him.

20            MR. ZUCKER:  But he wasn't whacked.

21            MS. WILKINSON:  He died of a drug overdose.

22            THE COURT:  What this gentleman was told by Mr.

23    Morales.

24            MR. CLARKE:  In other words, Mr. Zucker I think

25    is admitting that he's not going to prove or disprove that

CROSS-EXAMINATION OF STOKES

```
 1    Mark Bartlett or Junior died or didn't die of an overdose.
 2    So the fact that we're heading in that direction is not
 3    relevant.  I think you can bring out whether or not he
 4    admitted to other murders and whom.  But that's it.
 5    There's no need to go into the details of who Mr. Bartlett
 6    is and whether he testified at a former trial.
 7              MR. ZUCKER:  On the contrary, there's great
 8    reasons to go into this man making false accusations
 9    against Jose Morales.
10              THE COURT:  And you've been doing that all
11    morning long.
12              MR. ZUCKER:  But these are other false
13    accusations.  He's claiming that --
14              THE COURT:  You have already gone into trying to
15    disprove what he testified to what Morales told him.  And
16    we are getting into the merits of the other case.  The
17    autopsy report --
18              MR. ZUCKER:  I think they've already looked into
19    that.  We certainly have.  He died -- what's his name?
20    Junior died --
21              MR. CLARKE:  He's not on trial for killing
22    Junior.  He's not on trial for killing Barlett.
23              MS. WILKINSON:  Well, let me just say I think,
24    Your Honor, the relevant point of it as Mr. Clarke has
25    suggested, it is very possible that Jose was bragging
```

 1    about these murders so people would have -- give him more

 2    gravitas in the prison.  That he was saying he had these

 3    other three witnesses killed.  It's possible he was

 4    involved in these three murders.  I frankly have not

 5    investigated these other three murders yet.  There were

 6    three deaths that are very suspicious and good timing for

 7    Mr. Morales.  Having said that, the important part is what

 8    this witness was told by Mr. Morales.  That's it.  Simply

 9    that he had another person killed.  Whether it's

10    exaggeration or the truth or not is beside the point.

11          MR. CLARKE:  And the Court should be aware the

12    government has no evidence that Mr. Morales killed

13    Mr. Bartlett.  I think under 403, Your Honor, because of

14    the undue and unfair prejudice that could possibly happen

15    to the government, how confusing it is, getting into the

16    Demetrius Smith case and the lack of probative value in

17    the long run as to the defendant's case as to the minor

18    issue of Mark Bartlett, Your Honor, and whether it's

19    braggadocio or something else, we ask that he not go into

20    Mark Bartlett or any other witness that testified.

21          MR. ZUCKER:  Judge, I agree.  I could care less

22    that it's Mark Bartlett.  What I care about is that this

23    man, the witness on the stand that the government has

24    called, is claiming that Mr. Morales committed the

25    murders.  That never occurred.

1          THE COURT:  He didn't say Mr. Morales committed

2    the murders.

3          MR. ZUCKER:  That's exactly what he's saying.

4          THE COURT:  But we're not going to go into the

5    question of whether or not Morales was correct when he

6    told him these things.

7          MR. ZUCKER:  Judge, that's the precise point.

8    He's claiming that Morales told him about murders that

9    weren't murders.  He's making this up.

10         THE COURT:  That's not what he said.  He's told

11   you that Morales has testified about murders.

12         MR. ZUCKER:  Well, not testified.  But said.

13   But they weren't even murders is what I'm trying to get

14   at.  Rob Long was not -- not Rob Long.  Clyde Lucas was

15   not murdered.  That witness was not murdered.

16         THE COURT:  We don't know that.

17         MR. ZUCKER:  We do know that.  He testified he

18   was in the hospital and died of organ failure.  That's why

19   I elicited it.

20         THE COURT:  Organ failure can occur because of

21   drug use.

22         MR. ZUCKER:  Yes.  But not a hot shot.

23         THE COURT:  Overdose.

24         MR. ZUCKER:  Judge, he did not die of an

25   overdose.  He was in the hospital for a week.

CROSS-EXAMINATION OF STOKES

1     THE COURT:  He's not on trial for that.

2     MR. ZUCKER:  I believe I should be fairly

3  entitled to elicit from this witness that he is making

4  things up and the proof that he's making things up --

5     THE COURT:  You have been challenging his

6  veracity all morning long and you've gotten him to talk

7  about his writing screen plays and everything else.  The

8  jury hears your message.

9     MR. ZUCKER:  Judge, I agree.  But there's so

10  much more here and particularly the statement to Lam which

11  he's already acknowledged he believes referring to Long.

12  That he claims a different method of murder.

13     MR. CLARKE:  And counsel has covered that.  He's

14  covered it.  And so it's already been clear for the record

15  that we're talking about two murders and that's what this

16  letter stands for, Junior and Long and we're not going to

17  get into a third one.

18     THE COURT:  I don't think going into a third

19  incident --

20     MR. ZUCKER:  All right.

21     THE COURT:  Keep this other case out of this

22  case, not to confuse this jury.

23     MR. ZUCKER:  Okay.  And I don't intend to go

24  there.  I can't control the witness.  But I believe

25  there's more to do with this letter and I will -- I have

```
 1    no interest in going into Demetrius Smith or his trial.
 2              THE COURT:  Stay away from Demetrius Smith and
 3    stay away from the witness who was shot.
 4              MR. ZUCKER:  The witness?
 5              THE COURT:  Stay away from the witness who was
 6    in the Smith case.  Don't go there.
 7              MR. ZUCKER:  It's news to me.  The only one
 8    mentioned in here is the brother.
 9              MS. WILKINSON:  The bottom line, Your Honor, is
10    that this witness is confused by Mr. Morales' statements
11    because he's talking about several people involved in
12    several different murders.  That's the bottom line of all
13    this.
14              MR. CLARKE:  And counsel wanted this whole
15    letter in and it's dangerous to do it and I think we're in
16    dangerous territory, Your Honor.  And the letter is in.
17    But to ask him now to interpret everything that might lead
18    to a Demetrius Smith comment, you know, or a Mark Bartlett
19    comment should not be permitted.
20              MR. ZUCKER:  It's the Rob Long -- not Rob Long.
21    I believe we have to go into the Junior issue because
22    that's referenced in here.
23              THE COURT:  You can go into the Junior issue.  I
24    don't want you --
25              MR. ZUCKER:  The word, Demetrius Smith and
```

1    Bartlett won't come out of my mouth.

2                THE COURT:  The questions of how Clyde Lucas or

3    Junior Lucas died is not something he has any knowledge

4    about other than what he was told by Morales and we're not

5    going to go into isn't it a fact he died in a hospital of

6    organ failure.  We're not going to go into that.

7                MR. ZUCKER:  Well, except I believe that was

8    communicated to the government, investigated and they

9    realized it was complete nonsense, too.

10               MS. WILKINSON:  That's not true.

11               MR. CLARKE:  This witness to know whether it's

12   true or not true, Your Honor, there's no probative value

13   of having this witness understand what's being said to him

14   --

15               MR. ZUCKER:  I'm allowed to -- I want to not

16   come up here and I don't want to incur your wrath.  So the

17   ruling is I may keep inquiring about the Long murder

18   obviously.  That's the one at issue.

19               THE COURT:  You can go after Long.  You can go

20   after --

21               MR. ZUCKER:  Junior.

22               THE COURT:  -- Junior.  But do not go into --

23               MR. ZUCKER:  Fair enough.  I understand.  Thank

24   you.

25               (In open court:)

1    BY MR. ZUCKER:

2         Q    Well, simply, you testified about what Mr.

3    Morales told you in front of the grand jury after you

4    wrote this letter to Agent Lam.  Isn't that fair?

5         A    Repeat that, please.

6         Q    Sure.  You testified in front of the grand jury

7    on September 11, 2012 after you wrote this letter to

8    Mr. Lam.  Right?

9         A    Yes, sir.

10        Q    And you told the grand jury essentially the same

11   thing you told Agent Lam in this letter.  That Troy told

12   Morales he killed Long with a hot shot.  Isn't that

13   correct?

14        A    No.  That he tried to kill Rob Long with a hot

15   shot.  It didn't work.  So he shot him.

16        Q    Well, nowhere in your grand jury testimony of

17   September 11, 2012 do you claim he shot him, do you?

18        A    I don't remember my grand jury testimony.  I

19   will have to see it, sir.

20        Q    Okay.

21             MR. ZUCKER:  Page MS-28, grand jury, page 28 for

22   the benefit of counsel.

23             BY MR. ZUCKER:

24        Q    Have you looked at your grand jury testimony as

25   part of your preparation for testifying here today?  Has

1    it been shown to you?

2         A    Partially.

3         Q    Partially.  When did that occur?

4         A    Monday.

5         Q    Monday of this week?

6         A    Yes, sir.

7         Q    Two days ago?  Wednesday, Thursday.  Three days

8    ago?

9         A    Yes, sir.

10        Q    And of course, you reviewed the portion that

11   dealt with the killing of Rob Long because that's what you

12   are going to be testifying about here today.  Right?

13        A    We talked and I reviewed it partially.  I

14   can't -- right now, I can't really remember everything

15   that I read, but I will surely look at it if you want me

16   to.

17             MR. ZUCKER:  For identification Number 14.

18             BY MR. ZUCKER:

19        Q    Showing you Defendant's 14.  Do you recognize

20   this is a copy of the grand jury, your grand jury

21   testimony given on September 11, 2012, the one you

22   reviewed on Monday, don't you, sir?

23        A    Yes, sir.

24        Q    Okay.  And directing your attention for the

25   benefit of counsel, MS-28, page 28 and grand jury, page

1    28.  Beginning on page 27, last line.  "All right.  Did

2    he, referring to Mr. Morales, say whether or not he

3    learned how Troy got killed?  Answer:  Well" -- I'm sorry.

4    I read that wrong.  How Troy killed the guy.  Thank you.

5    My bad.  I appreciate that.  "Answer:  Well, he said

6    that -- I know he said that after Troy -- I want to make

7    sure I got it right.  I know that he said Troy came back

8    and told him, but then I know he also said -- he also told

9    Troy how to kill the guy.  Question:  All right.  So what

10   did Jose say he told Troy about how to kill the guy?

11   Answer:  A hot shot meaning a form of drug whether it was

12   heroin or cocaine mixed with some type of deadly content

13   because this guy got high I guess.  Question:  And did

14   Jose tell you whether or not that was -- whether or not

15   that worked or not.  Answer:  Well, the guy is deceased.

16   So if that worked or he did it another way, right now I

17   can't recall."  Right?

18       A    Yes.

19       Q    So that day, you said it was a hot shot as far

20   as you knew essentially.  Right?  And nowhere when you

21   testified in front of the grand jury did you claim that

22   Troy claimed to have shot the man or I'm sorry.  Let me

23   rephrase that.  That Jose said Troy said he shot the man.

24   Isn't that correct?

25       A    You mean in the grand jury?

CROSS-EXAMINATION OF STOKES

1      Q    Yes.

2      A    Yes.

3      Q    So which is the truth?  What you told the grand

4  jury, what you told Agent Lam or what you told this jury,

5  sir?  Which of those three versions of events is the truth

6  if you know?

7      A    Well, when I spoke to Mr. Lam, I told him the

8  truth.  When he asked me that question at the time I just

9  simply just -- it was a long time ago.  What I'm telling

10  the ladies and gentlemen of this jury today is the truth.

11      Q    Well, what you told the ladies and gentlemen of

12  this jury today or yesterday is that Jose told you Troy

13  said he shot the guy.

14      A    Um-hum.

15      Q    He shot the guy in the back of head.  Then he

16  turned around and he shot him in the front.  That's what

17  you told this jury.  Right?

18      A    I said when he shot --

19      Q    But what you told Agent Lam in the letter was

20  Troy said -- Jose said Troy said he killed him with a hot

21  shot.  Right?

22      A    You mean this letter right here?

23      Q    Yes.  That's what you said.

24      A    Excuse me --

25           THE COURT:  Mr. Zucker, let him answer your

107

1    question.  Do not interrupt him again.

2              THE WITNESS:  After reviewing this letter, like

3    I said, I know it's rules and regulations to this

4    testimony.  I don't know what I can get into, but after

5    reviewing this letter, this letter is not at all about

6    Mr. Ron.

7              BY MR. ZUCKER:

8        Q    Sir, isn't that what you just told this jury a

9    few minutes ago?

10       A    Like I said, I had to sit here and review it.

11   But I know that I can't really clarify what I need to say.

12   But this letter is not about -- unless you really want me

13   to go into it.  If I could go into it, but this letter is

14   not about Mr. Ron Long.

15       Q    Wasn't that your testimony a minute ago?

16   This --

17       A    I told you, I told you -- the only part of this

18   letter that is -- after sitting here clarifying it that is

19   in error is where it says snitch.

20       Q    So now this is about something else.  You were

21   wrong the first time you testified, huh?

22             THE COURT:  Don't argue with the witness.  Ask

23   him questions.

24             BY MR. ZUCKER:

25       Q    You were confused about who the snitch was?

1        A    No.  I know exactly what this letter is about if

2   you want to get into the whole letter.

3        Q    Well, you later claimed as you said yesterday

4   that Mr. Morales told you he had Lucas' brother killed.

5   Correct?

6        A    Mr. Morales told me he killed Lucas' brother

7   himself.

8        Q    Okay.  Killed him himself with a hot shot.

9   Poison mixed in with drugs.  Correct?

10       A    Yes.

11       Q    And that he did it himself.  Right?

12       A    Yes.

13       Q    Okay.  But of course, you later learned that

14   couldn't have happened.  Right, sir?

15       A    I don't know if he could or couldn't have.  I

16   don't know.  But that's what he said.

17       Q    I'm sorry.  I didn't mean to interrupt you.

18       A    He just said that I gave his brother a hot shot.

19   So when somebody said I gave, I take that as first person.

20   That's what I assume.  He said I gave.

21       Q    Well, and you said as you testified I think it

22   was in the grand jury and the letter, he said I personally

23   gave it to him.  Right?

24       A    He said I gave him a hot shot.

25       Q    And that would be Troy Lucas' brother, Clyde.

1      Correct?

2          A    I never knew his name.  He never mentioned his

3      name.

4          Q    Did you know that Troy Lucas' brother died while

5      Mr. Morales was incarcerated?

6          A    No, I did not.

7          Q    So you would agree that if Mr. Morales was

8      incarcerated and Troy Lucas' brother was not in the

9      institution, he could not have given him a hot shot

10     personally.  Right?

11         A    That is correct.

12         Q    Did you know Troy Lucas' brother died in a

13     hospital --

14              MR. CLARKE:  Objection, Your Honor.

15              THE COURT:  Sustained.

16              BY MR. ZUCKER:

17         Q    You don't know anything about --

18              THE COURT:  He doesn't know anything about how

19     he died.

20              THE WITNESS:  Only what Mr. Morales told me.

21              BY MR. ZUCKER:

22         Q    So Mr. Morales confessed another murder to you

23     and that was the murder of Troy's brother.  Right?

24         A    Yes, sir.

25         Q    And you do agree, don't you, sir, that nowhere

1    in the grand jury is there a claim that Mr. -- and if you

2    need to look at your testimony to be sure because it's

3    long, nowhere when you testified in front of the grand

4    jury did you ever claim that Mr. Morales told you Troy

5    said he shot Rob Long?

6         A    No.  That's not in the grand jury.

7         Q    Had you forgotten that when you spoke in front

8    of the grand jury?

9         A    I maybe was nervous and maybe forgotten.

10        Q    Well, you knew that you were there to testify

11   about the murder.  Right?

12        A    Yes, sir.  It didn't make it any easier.  You

13   know, that was my first time ever being in a situation in

14   front of a group of people testifying.

15        Q    Sir, it was an important event in your life,

16   wasn't it, sir?

17        A    Yes, it was.

18        Q    It was the only way you had to get out of

19   spending the rest of your life in prison was testifying

20   against Mr. Morales.

21             MR. CLARKE:  Objection.

22             THE COURT:  Sustained.  We have already gone

23   through this, sir.

24             BY MR. ZUCKER:

25        Q    When you went in there, were you careful to tell

CROSS-EXAMINATION OF STOKES

1    the truth, the whole truth as best you could remember it?

2        A    I did my best, sir.

3        Q    And somehow you left out the most crucial part.

4            MR. CLARKE:  Objection.  Argumentative.

5            THE COURT:  Sustained.

6            BY MR. ZUCKER:

7        Q    And of course, when you testified in front of

8    the grand jury, that was after you had discussed this with

9    your family and learned what was in the newspapers.

10   Right?

11       A    No, sir.

12           MR. ZUCKER:  Looking at the clock, judge, is

13   this --

14           THE COURT:  Are you about finished?

15           MR. ZUCKER:  I'm not sure.  I think there's

16   actually a fair amount more, but there's --

17           THE COURT:  I think we've pretty well covered

18   the waterfront with cross-examination.  You need to wrap

19   it up.

20           BY MR. ZUCKER:

21       Q    All right.  You had told Agent Lam on

22   August 21st that Morales said he personally gave a hot

23   shot to the brother.  Isn't that correct?

24           MR. CLARKE:  Objection.

25           THE COURT:  Sustained.  That's already been

1    asked and answered.

2    BY MR. ZUCKER

3         Q    Now of course, these conversations you had with

4    Mr. Morales when you were incarcerated, you can't identify

5    anyone else who was present who could corroborate that

6    they actually occurred, can you, sir?

7         A    No, sir.

8         Q    It's just you and him.  Right?

9         A    Yes, sir.

10             MR. ZUCKER:  Court's indulgence.

11             (Pause.)

12   BY MR. ZUCKER

13        Q    Now Mr. Morales asked you -- well, he wrote down

14   his mother's name and number.  Right?  You showed us that

15   slip of paper?

16        A    Yes, sir.

17        Q    And he asked you to check to see if Troy Lucas

18   was in jail in Baltimore.  Right?

19        A    Yes, sir.

20        Q    And he basically was very concerned about where

21   Troy Lucas was.  Right?

22        A    Yes, sir.

23        Q    And he was concerned about where Troy Lucas

24   was -- well, I guess at that point he hadn't told you that

25   he had already informed law enforcement that he believed

CROSS-EXAMINATION OF STOKES

1    Troy Lucas was the killer, had he?

2        A    No, sir.

3        Q    And you certainly know that if somebody in

4    prison cooperates against someone else, that's a

5    potentially dangerous situation.  Right?

6            THE COURT:  This has already been covered

7    completely, Mr. Zucker.

8            MR. ZUCKER:  Well, it's specifically as to Mr.

9    Lucas.

10           THE COURT:  Mr. Zucker, he already has been

11   asked about this.

12           MR. ZUCKER:  All right.

13           THE COURT:  I have a right to regulate excessive

14   cross-examination.  I think that's excessive.  You have

15   already covered that.

16           BY MR. ZUCKER:

17       Q    You would agree, wouldn't you, sir -- did you

18   know what DMI is?

19       A    Yes, sir.

20       Q    DMI is basically very hostile towards people who

21   cooperate against them --

22           MR. CLARKE:  Objection.  Is this a question?

23           BY MR. ZUCKER:

24       Q    Is that not true?

25       A    I don't know.

CROSS-EXAMINATION OF STOKES

```
1        Q    All right.  Did you know that Troy Lucas was
2   part of DMI?
3        A    No, sir.
4        Q    If you knew -- if Mr. Morales had cooperated
5   against a DMI member, would you expect him to be concerned
6   about where that person was for Mr. Morales' safety?
7             MR. CLARKE:  Objection.  Argumentative.
8             THE COURT:  Sustained.  He doesn't know about
9   DMI, Mr. Zucker.
10            MR. ZUCKER:  I'm sorry?
11            THE COURT:  He says he doesn't know about DMI.
12            MR. ZUCKER:  No.  He said he knew about them,
13   but he didn't know whether or not they were hostile
14   towards cooperators.
15            BY MR. ZUCKER:
16        Q    Forgot DMI for a moment, sir.  In your
17   experience -- you've expressed on Facebook hostility
18   towards the people who cooperated against your cousin.
19   Isn't that --
20            MR. CLARKE:  Objection.
21            THE COURT:  Sustained.
22            MR. ZUCKER:  It's predicate, judge.
23            THE COURT:  I sustain the objection.
24            BY MR. ZUCKER:
25        Q    If Mr. Morales had cooperated against Troy
```

CROSS-EXAMINATION OF STOKES

```
 1        Lucas, it would be fair to assume he would be concerned
 2        about --
 3                 MR. CLARKE:  Objection.
 4                 BY MR. ZUCKER:
 5           Q    -- repercussions from Mr. Lucas.  Is that a fair
 6        statement?
 7                 THE COURT:  Overruled.  You can answer that.
 8        But that I think we covered that already.
 9                 THE WITNESS:  Can you say that again, please?
10                 BY MR. ZUCKER:
11           Q    Sure.  If Mr. Morales had cooperated against
12        Troy Lucas and they were both in prison, he would be --
13        you would expect him to be concerned about where Mr. Lucas
14        was in terms of potential get back --
15                 MR. CLARKE:  Objection as to Mr. Lucas'
16        expectations.
17                 THE COURT:  That's sustained.
18                 BY MR. ZUCKER:
19           Q    Would you expect --
20                 THE COURT:  Sustained I said.
21                 MR. ZUCKER:  I'll rephrase a different question
22        as to Mr. Morales' concern.
23                 THE COURT:  Well, ask a new question.
24                 MR. ZUCKER:  I thought I rephrased --
25                 THE COURT:  I sustained the objection to the
```

CROSS-EXAMINATION OF STOKES

1    question.  Ask a new question.

2              BY MR. ZUCKER:

3        Q    The question is this.  If Mr. Morales had

4    cooperated against Troy Lucas, the killer of Rob Long,

5    would you expect Mr. Morales to be concerned about

6    repercussions from Mr. Lucas?

7              MR. CLARKE:  Objection.  Speculation again.

8              THE COURT:  Sustained.  It has very little to do

9    which anything appropriate on cross-examination of this

10   witness on the subjects he's testified about.  So ask

11   him --

12             BY MR. ZUCKER:

13       Q    You're certainly concerned about repercussions

14   from Mr. Morales having testified against him, aren't you,

15   sir?

16             MR. CLARKE:  Objection.

17             THE COURT:  Sustained.  Move on to another

18   question.

19             MR. ZUCKER:  Court's indulgence.  Can I have a

20   moment to consult before I rest finally, judge?

21             THE COURT:  You may.

22             (Pause.)

23   BY MR. ZUCKER

24       Q    You were cell mates for a brief time with Dustin

25   Ray, were you not, sir?

```
 1        A    One day.

 2        Q    So you know each other?

 3        A    If that's --

 4        Q    You were together for at least a day.  Right?

 5        A    Yes.

 6        Q    You both knew each other as guys from Baltimore?

 7        A    I don't know where Dustin is from.

 8        Q    Did you tell other people -- another inmate at

 9   Allenwood that you were going to lie on Mr. Morales in

10   this trial?

11        A    Never.

12             MR. ZUCKER:  Moment to consult.

13             (Pause.)

14             BY MR. ZUCKER:

15        Q    Sir, you claimed that the series of numbers --

16   well, first off, Mr. Morales identified Troy by name, but

17   left out his last name initially.  Is that a fair

18   statement?

19        A    Yes.

20        Q    And later on, he told you his last name was

21   Lucas.  Right?

22        A    Yes.

23        Q    And then you claimed he wrote it out in code by

24   using numbers.  Right?

25        A    Yes, sir.
```

1    Q    That wasn't something you wrote?

2    A    No, sir.

3         MR. ZUCKER:  Thank you.  No further questions.

4         (Excerpt concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    <u>CERTIFICATE OF REPORTER</u>

2

3              I, Lisa K. Bankins, an Official Court Reporter

4    for the United States District Court for the District of

5    Maryland, do hereby certify that I reported, by machine

6    shorthand, in my official capacity, the proceedings had

7    and testimony adduced upon the trial in the case of the

8    United States of America versus Jose Joaquin Morales,

9    Criminal Action Number 12-0480, in said court on the 3rd

10   day of October, 2013.

11             I further certify that the foregoing 89 pages

12   constitute the official transcript of said proceedings, as

13   taken from my machine shorthand notes, together with the

14   backup tape of said proceedings to the best of my ability.

15             In witness whereof, I have hereto subscribed my

16   name, this 6th day of October, 2013.

17

18

19                              *Lisa K. Bankins*

20                              Lisa K. Bankins
                                Official Court Reporter
21

22

23

24

25

' 
'86 [1] 45/17
'94 [1] 45/12

**0**

0480 [2] 31/3 120/9
070 [2] 45/11 45/11

**1**

1-A [3] 36/19 38/1 43/8
10 [1] 36/11
11 [5]
11th [2] 34/18 36/9
12 [2] 75/17 80/2
12-0480 [1] 120/9
126 [1] 85/20
13 [5]
1350 [1] 31/19
14 [4]
14th [1] 64/21
16 [2] 59/5 63/12
1999 [2] 50/8 55/5

**2**

20's [1] 80/15
20036 [1] 31/20
2012 [15]
2013 [3] 31/5 120/10 120/16
202 [1] 31/19
20770 [1] 31/23
21 [2] 41/12 42/16
21201 [1] 31/13
21202 [1] 31/16
21st [1] 112/22
24 [1] 61/19
26 [1] 85/22
27 [1] 106/1
28 [5]

**3**

30 [3] 76/7 80/14 85/13
30th [2] 47/10 47/17
35 [6]
36 [1] 31/12
3rd [1] 120/9

**4**

40 [1] 80/11
403 [1] 99/13
45 [1] 75/20
46 [1] 75/20
47 [1] 32/5
4th [2] 64/15 69/23

**5**

50 [1] 80/11

**6**

6500 [1] 31/22
6:00 [1] 47/5
6th [1] 120/16

**8**

89 [1] 120/11

**9**

9:30 [2] 31/6 47/5

**A**

a.m [1] 31/6
ability [1] 120/14
able [1] 78/15

about [102]
above [2] 37/6 45/23
Absolutely [3] 64/4 64/7 81/24
access [9]
accommodation [1] 89/18
accurate [1] 85/23
accurately [1] 73/1
accusations [2] 98/8 98/13
accuse [1] 57/7
acknowledge [1] 59/22
acknowledged [2] 55/10 101/11
Action [1] 120/9
actual [1] 72/6
actually [11]
addition [2] 49/23 82/4
additional [1] 85/17
address [3] 39/12 41/1 42/10
adduced [1] 120/7
adjustment [5]
admitted [2] 90/18 98/4
admitting [2] 88/21 97/25
advanced [1] 54/22
affecting [1] 61/23
affects [1] 61/25
affidavit [1] 52/7
affidavits [7]
afoul [1] 71/3
after [26]
afterwards [2] 84/12 85/17
again [12]
against [31]
agent [12]
agent's [3] 75/6 75/14 75/25
agents [5]
ago [13]
agree [14]
agreed [2] 53/9 73/17
agreeing [1] 53/2
agreement [1] 53/6
ahead [2] 91/10 91/13
Akeem [2] 64/8 64/8
all [55]
Allenwood [10]
allowed [2] 62/15 103/15
along [3] 75/2 75/18 86/24
alphabet [1] 46/9
alphabets [1] 45/8
already [34]
also [19]
Although [1] 55/4
always [3] 91/24 94/17
am [1] 84/3
AMERICA [2] 31/3 120/8
among [1] 60/25
amount [2] 80/12 112/16
another [21]
answer [19]
answered [4]
any [12]
anybody [2] 46/3 53/1
anybody's [1] 59/24
anyone [3] 49/15 58/6 113/5
anything [12]
anything about [1] 49/12
APPEARANCES [1] 31/10
appeared [1] 41/13
appears [2] 39/11 44/9
appreciate [1] 106/5
approach [4]
appropriate [2] 72/23 117/9
approximately [1] 81/3
April [3] 45/12 47/1 50/7
April '94 [1] 45/12

are [38]
area [3] 47/6 61/18 62/18
aren't [2] 60/23 117/14
argue [4]
argument [1] 67/16
Argumentative [3] 70/8 112/4 115/7
around [4]
arranging [2] 74/6 74/8
arrived [1] 36/6
article [1] 78/2
articles [3] 36/1 36/3 83/22
articulate [1] 81/18
as [70]
ask [39]
asked [21]
Askia [2] 51/9 51/17
asking [16]
asks [1] 51/2
ass [4]
assault [1] 60/15
assaulted [1] 61/20
assaults [1] 62/3
assessment [1] 76/8
assist [2] 56/1 57/1
assistance [5]
assume [3] 43/2 109/20 116/1
assumed [7]
at [47]
attack [1] 62/21
attempted [1] 55/15
attention [3] 45/10 94/23 105/24
attorney [2] 33/23 74/1
Attorney's [2] 31/11 33/10
attribute [1] 59/19
attributed [2] 83/17 92/18
attributing [2] 62/11 84/15
August [2] 85/22 112/22
August 21st [1] 112/22
August 26 [1] 85/22
authorities [5]
automatically [1] 93/18
autopsy [1] 98/17
Avenue [1] 31/19
aware [5]
away [5]

**B**

B.O.P [1] 78/25
back [16]
backup [1] 120/14
bad [2] 61/12 106/5
bag [1] 40/5
Baltimore [35]
Bankins [4]
Barlett [1] 98/22
Bartlett [15]
based [7]
basically [6]
basis [5]
BCDC [1] 50/7
be [49]
became [1] 79/2
because [24]
been [20]
before [4]
Beginning [1] 106/1
behalf [1] 32/3
being [13]
believe [13]
believed [1] 113/25
believes [1] 101/11
bench [7]
benefit [4]

## B

beside [1] 99/10
besides [1] 95/21
best [5]
between [1] 53/9
birds [1] 39/22
bit [1] 77/2
blemish [2] 61/12 61/15
bone [7]
book [1] 39/19
both [3] 77/21 116/12 118/6
bothered [2] 64/16 64/18
bottom [6]
BP148 [1] 45/11
BP148-070 [1] 45/11
BPS148 [1] 45/11
BPS148-070 [1] 45/11
braggadocio [1] 99/19
bragging [1] 98/25
Brenda [1] 33/9
brief [1] 117/24
bring [4]
brother [15]
brothers [1] 50/25
brought [2] 35/11 97/13
Brown [2] 49/24 55/16
buds [1] 40/6
bureau [2] 45/1 80/1
business [3] 39/4 39/10 74/21
but [80]

## C

caliber [2] 77/25 78/3
call [4]
called [2] 35/9 99/24
came [17]
can [53]
can't [15]
capacity [1] 120/6
captain [2] 62/8 62/13
care [3] 87/25 99/21 99/22
careful [1] 111/25
Carmenza [2] 42/14 42/17
carried [1] 61/11
case [33]
cases [1] 58/21
cell [7]
Center [1] 42/2
Certain [1] 89/19
certainly [13]
CERTIFICATE [1] 120/1
certify [2] 120/5 120/11
challenging [1] 101/5
chance [2] 62/8 91/16
change [1] 63/6
changed [2] 63/22 63/24
changes [1] 60/25
charge [1] 62/8
charges [1] 49/3
Charles [1] 31/12
check [1] 113/17
Cherrywood [1] 31/22
City [10]
claim [6]
claimed [9]
claiming [5]
claims [1] 101/12
clarification [1] 69/8
clarify [3] 73/11 85/25 108/11
clarifying [3] 85/16 86/8 108/18
CLARKE [11]
clear [5]

clearly [3] 68/7 93/15 94/18
sclerb[n] 48/13
clock [1] 112/12
close [1] 64/12
Clyde [11]
co [3] 50/14 50/24 71/24
co-defendant [1] 71/24
co-defendants [1] 50/24
co-defendants' [1] 50/14
cocaine [1] 106/12
code [1] 118/23
color [1] 41/6
coloring [1] 41/14
come [19]
comes [1] 90/4
comfortable [1] 63/13
coming [2] 80/18 90/6
comment [2] 102/18 102/19
committed [5]
communicate [1] 45/2
communicated [1] 103/8
communication [1] 51/24
compare [2] 46/8 58/6
complaint [1] 44/19
complaints [1] 44/23
complete [1] 103/9
completely [1] 114/7
concern [1] 116/22
concerned [8]
concluded [1] 119/4
conclusion [2] 55/12 55/14
conference [3] 67/3 87/15 96/3
confessed [2] 95/23 110/22
confront [2] 51/10 51/10
confuse [1] 101/22
confused [5]
confusing [3] 95/20 96/5 99/15
Connecticut [1] 31/19
considered [1] 56/4
consistent [1] 49/21
conspiracy [4]
conspired [2] 49/4 52/22
conspiring [4]
constantly [1] 62/2
constitute [1] 120/12
consult [5]
contact [4]
content [1] 106/12
CONTENTS [1] 32/1
context [1] 92/14
continue [1] 95/25
continuing [1] 33/5
contradictory [1] 49/25
contrary [1] 98/7
control [1] 101/24
conversation [2] 50/16 50/21
conversations [6]
convict [1] 56/7
convicted [4]
convicting [1] 56/17
cooperate [3] 51/12 51/25 114/21
cooperated [5]
cooperates [1] 114/4
cooperating [2] 42/5 71/24
cooperation [1] 72/20
cooperator [1] 71/16
cooperators [1] 115/14
copy [2] 85/23 105/20
Core [1] 78/13
Cornell [1] 51/18
corner [1] 42/20
correct [60]
corroborate [1] 113/5

could [16]
couldn't [2] 108/14 108/15
counsel [8]
course [7]
court [13]
Court's [5]
courthouse [2] 34/25 36/9
cousin [13]
cousins [2] 51/18 51/22
covered [7]
creative [1] 82/15
crime [3] 56/7 56/12 57/7
crimes [1] 58/9
Criminal [2] 31/3 120/9
cross [6]
cross-examination [6]
crucial [1] 112/3
cry [1] 66/19
CTF [2] 41/23 42/4
curious [1] 50/22
current [2] 42/7 72/20
currently [2] 48/3 61/18
cut [4]
cuz [2] 64/22 64/24

## D

D.C [1] 31/20
D.E.A [8]
daily [1] 45/15
dangerous [4]
Danielle [2] 50/5 51/19
date [3] 45/18 47/12 87/4
dated [1] 45/11
daughter [1] 78/22
day [8]
days [5]
dead [1] 96/8
deadly [1] 106/12
dealt [1] 105/11
death [2] 67/12 97/3
deaths [1] 99/6
debriefed [1] 85/3
deceased [2] 64/14 106/15
defendant [3] 31/6 31/15 71/24
defendant's [3] 75/17 99/17 105/19
defendants [1] 50/24
defendants' [1] 50/14
defense [5]
definitely [1] 90/2
degree [2] 58/14 91/17
delivered [2] 81/9 82/24
Demetrius [8]
deny [3] 74/23 75/1 76/6
depending [1] 91/5
describing [1] 88/16
destruction [2] 65/25 70/19
details [1] 98/5
Detention [1] 42/2
did [64]
didn't [33]
die [5]
died [16]
different [3] 101/12 102/12 116/21
difficult [1] 60/17
direct [3] 57/21 72/18 78/24
directing [1] 105/24
direction [1] 98/2
directly [5]
discourage [1] 50/17
discouraged [1] 51/3
discussed [1] 112/8
disprove [2] 97/25 98/15
DISTRICT [6]

## D

DIVISION [1] 31/2
DMI [7]
do [62]
document [2] 76/5 89/23
does [4]
doesn't [11]
doing [5]
don't [65]
done [4]
door [5]
down [13]
drafts [1] 82/7
draw [1] 45/9
drug [11]
drugs [11]
during [1] 93/5
Dustin [2] 117/24 118/7

## E

each [3] 79/5 118/2 118/6
ear [1] 40/6
earlier [2] 46/12 50/1
early [1] 80/15
earphones [1] 40/6
easier [1] 111/12
East [1] 31/16
EDWARD [1] 31/15
Eight [1] 31/16
either [4]
Elgin [1] 39/17
elicit [1] 101/3
elicited [1] 100/19
else [11]
encourage [1] 50/12
end [1] 67/19
enforcement [1] 113/25
enhancement [1] 53/12
enough [1] 103/23
entirety [1] 89/20
entitled [1] 101/3
envelope [3] 36/8 37/18 38/22
equal [1] 52/19
erroneous [1] 55/14
erroneously [5]
error [4]
ESQUIRE [4]
essentially [3] 89/6 104/10 106/20
establish [2] 62/18 90/17
even [8]
event [2] 48/21 111/15
events [1] 107/5
eventually [1] 72/7
ever [6]
every [5]
everything [9]
evidence [9]
exact [1] 69/17
exactly [4]
exaggeration [1] 99/10
examination [6]
examine [1] 68/6
except [2] 97/13 103/7
Excerpt [1] 119/4
excerpts [1] 90/1
excessive [2] 114/13 114/14
Excuse [3] 74/25 87/20 107/24
exhibit [9]
exhibits [1] 76/15
expect [4]
expectations [1] 116/16
experience [1] 115/17

expertise [1] 82/18
explain [2] 66/8 81/1
explained [1] 46/1
expressed [5]
expresses [1] 67/13
expressing [3] 66/16 66/23 70/17
eyeglass [1] 35/17
eyeglasses [1] 35/23
eyewitness [1] 96/14

## F

face [1] 77/9
Facebook [5]
fact [10]
facts [1] 83/16
failure [3] 100/18 100/20 103/6
fair [12]
fairly [1] 101/2
false [7]
familiar [1] 83/22
family [8]
far [5]
faster [1] 75/19
father [1] 35/9
federal [3] 42/2 69/25 78/25
feel [1] 64/25
felt [1] 70/17
female [1] 36/20
few [3] 80/10 81/17 108/9
figured [1] 34/1
file [1] 54/20
filed [1] 54/14
fill [1] 44/19
finally [1] 117/20
find [12]
finding [1] 84/14
fine [3] 89/21 96/21 97/10
fingerprints [2] 40/17 40/20
finish [5]
finished [3] 69/21 97/15 112/14
first [21]
five [6]
flagging [1] 97/16
Floor [1] 31/13
focus [1] 68/17
follow [1] 86/24
following [5]
foregoing [1] 120/11
Forgot [1] 115/16
forgotten [2] 111/7 111/9
form [7]
former [1] 98/6
forms [1] 44/22
found [3] 69/19 84/12 88/16
Fourth [1] 31/13
frankly [1] 99/4
free [1] 60/8
frequently [2] 79/13 81/25
friend [1] 36/20
friends [6]
front [16]
fuck [3] 64/23 66/1 66/16
full [1] 68/8
further [2] 119/3 120/11
furtherance [1] 48/11

## G

game [1] 82/9
Gary [2] 31/15 31/15
gave [18]
generally [2] 57/25 58/17
gentleman [1] 97/22
gentlemen [2] 107/10 107/11

get [39]
getting [15]
give [9]
given [4]
gives [1] 59/16
Giving [1] 54/3
glad [1] 88/24
go [27]
goes [2] 88/2 94/19
going [31]
gone [6]
good [6]
got [20]
gotten [2] 52/24 101/6
government [8]
Government's [6]
grab [1] 45/16
grand [25]
gravitas [1] 99/2
great [1] 98/7
Greenbelt [2] 31/4 31/23
greeted [1] 87/3
group [1] 111/14
guarded [1] 63/8
guess [9]
gun [7]
guy [18]
guy's [3] 91/2 91/22 94/10
guys [14]
gym [1] 50/7

## H

had [62]
hadn't [1] 113/24
hand [1] 97/16
handed [1] 45/21
handle [2] 96/20 97/5
handwriting [4]
hang [1] 79/13
hanging [2] 79/10 79/16
happen [2] 96/24 99/14
happened [5]
happening [1] 87/24
happens [1] 53/22
harm [1] 69/2
has [28]
hasn't [2] 63/13 89/5
have [68]
haven't [4]
having [12]
he [219]
he's [29]
head [12]
heading [1] 98/2
heard [2] 60/12 88/22
hearing [1] 34/24
hears [1] 101/8
hearsay [3] 37/10 62/25 62/25
heavy [1] 73/17
Hello [1] 48/2
help [2] 56/4 70/18
helping [1] 56/11
her [17]
here [25]
hereby [1] 120/5
hereto [1] 120/15
heroin [1] 106/12
high [2] 80/14 106/13
highlighted [1] 75/22
him [94]
himself [3] 109/7 109/8 109/11
his [51]
Holly [5] 49/24 55/15

## H

home [2] 69/25 79/23
homeboys [1] 79/14
Honor [31]
HONORABLE [1] 31/8
hope [3] 51/2 71/2 95/9
hopes [3] 54/10 54/12 67/11
hoping [1] 95/13
hospital [6]
hostile [3] 62/12 114/20 115/13
hostility [1] 115/17
hot [25]
hours [1] 61/19
how [23]
huh [3] 81/23 84/2 108/21
hum [2] 93/14 107/14
hung [1] 79/1

## I

I'd [2] 69/8 82/14
I'll [5]
I'm [56]
I've [2] 58/11 63/22
I.D [1] 41/2
identification [3] 75/17 76/16 105/17
identified [2] 35/13 118/16
identify [1] 113/4
if [73]
imagination [1] 82/12
immediately [1] 65/14
implication [1] 67/21
importance [1] 42/22
important [3] 41/21 99/7 111/15
in [238]
incarcerated [5]
incident [1] 101/19
include [1] 37/18
included [5]
including [1] 51/9
incur [1] 103/16
indulgence [4]
information [24]
informed [1] 113/25
initially [3] 46/3 47/9 118/17
inmate [3] 61/16 63/2 118/8
inmates [6]
inquired [1] 71/8
inquiring [1] 103/17
inside [3] 40/11 40/12 44/2
institution [1] 110/9
Intel [2] 62/9 62/14
intelligent [3] 81/19 82/1 82/15
intend [5]
intended [1] 68/21
intent [5]
intention [3] 40/18 69/14 69/20
interest [3] 39/7 39/21 102/1
Internet [11]
interpret [1] 102/17
interpreted [1] 71/4
interrupt [4]
interviewed [1] 34/21
intimidate [1] 50/5
intimidating [1] 52/4
into [28]
investigated [2] 99/5 103/8
investigating [1] 55/23
involved [11]
involving [1] 48/22
is [144]
isn't [42]
issue [4]

it [246]
it's [58]
its [1] 89/20
itself [1] 89/8

## J

jail [5]
James [1] 39/17
JOAQUIN [2] 31/5 120/8
job [1] 56/24
Jonathan [2] 31/18 31/18
JOSE [17]
judge [14]
judge's [1] 55/14
July [5]
July 30 [2] 76/7 85/13
July 30th [1] 47/17
jump [6]
jumping [3] 59/12 59/24 84/16
June [5]
June 14 [2] 67/5 68/1
June 14th [1] 64/21
Junior [14]
Junior's [2] 88/15 88/19
junkie [1] 96/15
jury [38]
just [69]
justice [2] 49/1 52/5

## K

keep [3] 49/13 101/21 103/17
keeps [1] 89/6
kill [10]
killed [20]
killer [6]
killing [8]
kind [3] 68/15 84/5 95/20
knew [6]
know [73]
knowledge [4]
known [1] 60/18
knows [1] 38/8

## L

labeled [1] 60/22
lack [1] 99/16
ladies [2] 107/10 107/11
laid [1] 45/15
Lam [20]
Lane [1] 31/22
language [1] 88/18
last [8]
later [10]
Laugh [1] 66/19
law [6]
lead [1] 102/17
leaf [1] 67/8
learn [1] 34/14
learned [5]
least [3] 86/1 94/2 118/4
left [6]
legal [1] 52/18
less [1] 99/21
let [13]
Let's [1] 57/21
letter [46]
letters [7]
library [7]
lie [3] 53/14 61/10 118/9
lied [2] 53/16 70/1
life [8]
like [30]
likely [1] 61/11

limited [1] 78/10
line [9]
Links [1] 78/13
Lisa [4]
Listen [1] 44/15
little [10]
live [3] 61/7 61/25 63/6
living [2] 61/3 63/19
LLC [1] 31/15
locked [1] 59/5
long [44]
longer [4]
look [7]
looked [6]
looking [2] 39/3 112/12
looks [3] 44/5 44/6 94/15
love [1] 64/10
Lucas [29]
Lucas' [10]
Lumpkin [1] 96/16

## M

machine [2] 120/5 120/13
machinery [1] 73/18
made [4]
magazine [2] 36/1 36/3
magazines [1] 78/5
mailed [1] 34/5
main [1] 96/14
make [9]
making [5]
man [6]
management [1] 44/24
managers [1] 44/20
many [2] 80/8 83/16
Mark [10]
marked [2] 75/17 85/20
MARSHAWN [2] 31/8 32/4
MARTIN [1] 31/12
Marty [1] 84/7
MARYLAND [6]
mates [1] 117/24
math [1] 42/20
matter [12]
may [11]
maybe [12]
me [63]
mean [22]
meaning [3] 70/14 95/4 106/11
means [9]
meant [8]
mechanical [1] 31/25
media [1] 60/11
meeting [2] 47/15 47/16
member [1] 115/5
members [1] 44/24
memory [5]
mention [2] 91/22 94/10
mentioned [4]
mentioning [1] 33/21
mentions [1] 92/11
merits [1] 98/16
message [1] 101/8
met [3] 57/18 79/10 80/2
method [1] 101/12
middle [2] 67/25 75/22
might [3] 95/3 95/3 102/17
mine [2] 36/20 37/15
minor [1] 99/17
minute [3] 62/22 72/14 108/15
minutes [1] 108/9
misinformation [1] 53/18
mistaken [4]

Case 1:11-cr-00514-DKC Document 112-2 Filed 10/14/13 Page 95 of 98

## M

misunderstanding [1] 88/11
mixed [3] 93/5 106/12 109/9
mom [6]
mom's [1] 42/11
moment [9]
Monday [3] 105/4 105/5 105/22
money [3] 38/17 38/19 74/18
month [1] 47/15
MORALES [103]
Morales' [5]
more [9]
morning [7]
most [2] 41/21 112/3
mother [5]
mother's [6]
mothers [1] 50/25
motion [7]
mouth [1] 103/1
move [6]
moved [1] 89/5
movies [2] 82/9 82/14
moving [1] 90/15
Mr [155]
Mr. [47]
Mr. Askia [1] 51/17
Mr. Bartlett [3] 96/10 98/5 99/13
Mr. Clarke had [1] 73/7
Mr. Clyde [1] 97/2
Mr. Lam [7]
Mr. Long [2] 71/20 88/12
Mr. Lucas [3] 116/5 116/13 117/6
Mr. Lucas' [1] 116/15
Mr. Marty [1] 84/7
Mr. Morales [6]
Mr. Morales' [1] 102/10
Mr. Needleman [6]
Mr. Rob [1] 72/20
Mr. Ron [4]
Mr. Stokes [5]
Mr. Troy [3] 41/21 41/23 42/3
Mr. Zucker [1] 97/24
MS [4]
MS-126 [1] 85/20
MS-28 [2] 104/21 105/25
MS-45 [1] 75/20
Ms. [3] 33/14 33/16 33/20
Ms. Sandra [3] 33/14 33/16 33/20
much [4]
Mulberry [1] 31/16
murder [30]
murdered [10]
murders [20]
must [1] 39/19
my [35]

## N

name [25]
named [7]
names [1] 95/15
nature [1] 44/25
near [1] 80/12
necessarily [2] 52/6 52/19
need [7]
needed [1] 38/17
Needleman [23]
needs [1] 45/16
negatively [1] 33/23
neighborhood [1] 80/11
neighborhoods [1] 79/8
nervous [1] 111/9
never [16]

new [4]
news [1] 103/7
newspaper [2] 78/1 78/2
newspapers [2] 80/18 112/9
next [2] 88/2 95/8
niece [1] 96/22
night [2] 47/5 90/18
no [69]
nobody [4]
none [2] 80/17 81/3
nonsense [1] 103/9
nor [2] 73/4 73/13
not [131]
note [4]
notereading [1] 31/25
notes [1] 120/13
nothing [6]
notified [1] 72/6
notify [1] 41/25
novels [1] 82/8
now [35]
nowhere [5]
number [14]
numbers [6]
NW [1] 31/19

## O

O'Keefe [1] 85/13
oath [2] 33/5 33/6
objection [40]
obstruct [1] 52/5
obstruction [1] 48/25
obtained [2] 44/4 85/17
obviously [3] 37/9 81/18 103/18
occur [4]
occurred [3] 77/16 99/25 113/6
October [5]
October '86 [1] 45/11
off [8]
offer [3] 89/24 89/25 90/2
offered [1] 89/12
offering [1] 38/11
offhand [1] 43/14
Office [3] 31/11 31/18 33/10
Offices [1] 31/15
official [1] 79/21 81/5 81/6
Oh [4]
Okay [35]
on [102]
once [10]
one [26]
ones [1] 36/5
ongoing [1] 48/8
only [17]
onto [1] 88/2
open [3] 68/23 90/20 103/25
openly [1] 58/8
or [75]
organ [3] 100/18 100/20 103/6
origin [2] 44/12 44/16
original [3] 47/2 47/3 47/4
other [40]
other's [1] 43/17
others [1] 53/9
Otherwise [1] 65/9
out [28]
outside [1] 43/9 97/1
over [4]
overdose [8]
overdoses [1] 96/13
Overruled [3] 38/15 116/7
own [4]

## P

P's [1] 37/17
page [7]
pages [2] 36/1 120/11
pain [2] 65/25 70/19
painful [1] 90/5
paper [28]
papers [2] 79/23 80/25
paragraph [3] 75/21 75/22 95/17
parole [2] 48/4 48/22
part [12]
partially [3] 105/2 105/3 105/13
participant [2] 74/24 75/2
particular [2] 49/3 76/9
particularly [1] 101/10
partners [1] 74/21
party [2] 78/19 78/21
pass [1] 82/1
Pause [9]
penal [2] 60/8 60/12
pending [2] 49/4 73/18
Pennsylvania [1] 46/23
people [30]
perception [1] 56/5
period [1] 33/9
perjury [3] 49/23 55/11 55/15
permitted [1] 102/19
person [13]
personally [3] 109/22 110/10 112/22
perspective [1] 50/22
phase [1] 94/12
Philly [7]
phone [10]
phrased [1] 72/23
physical [1] 68/21
piece [9]
place [1] 43/7
plastic [1] 40/5
played [4]
plays [2] 82/7 101/7
please [12]
point [8]
pointed [1] 48/25
Poison [1] 109/9
police [1] 70/14
police's [1] 45/15
popped [5]
popping [3] 88/7 88/11 88/17
portion [4]
position [1] 60/18
possession [1] 37/5
possibility [1] 48/4
possible [3] 85/7 98/25 99/3
possibly [1] 99/14
post [5]
posted [1] 64/22
posting [1]
postings [1] 68/1
posts [1] 66/9
potential [2] 54/13 116/14
potentially [1] 114/5
precise [1] 100/7
predicate [2] 57/22 115/22
prejudice [1] 99/14
preparation [1] 104/25
prepared [2] 75/7 75/7
prescription [2] 35/17 35/21
presence [1] 35/8
present [2] 43/21 113/5
pretext [1] 89/20
pretty [3] 87/24 94/20 112/17
previously [3] 46/16 50/17 51/19

Case 1:11-cr-00514-DKC   Document 112-2   Filed 10/14/13   Page 96 of 98

**P**

prior [3]  34/21 63/10 72/13
prison [21]
prisoners [1]  58/10
privileges [1]  38/17
probably [5]
probative [2]  99/16 103/12
problem [4]
problems [1]  77/21
proceedings [4]
Proctor [3]  31/15 31/15 94/13
produced [1]  31/25
proffer [1]  77/6
proof [1]  101/4
property [1]  39/5
prosecuted [1]  58/9
prosecuting [2]  33/22 55/23
prosecution [8]
prosecutor [1]  48/24
prove [2]  97/1 97/25
provide [3]  56/10 56/11 56/16
provided [9]
providing [2]  55/22 58/1
public [2]  60/3 60/6
publications [1]  78/7
purple [2]  41/6 41/14
purpose [5]
purposes [1]  38/13
put [12]
puts [2]  60/17 61/9

**Q**

quarrel [1]  81/23
question [47]
questions [8]
quick [1]  76/19
quite [1]  77/2

**R**

raising [1]  97/16
rat [2]  60/22 64/24
Ray [1]  117/25
re [1]  88/13
re-read [1]  88/13
read [25]
reading [3]  68/5 82/2 82/4
reads [1]  87/25
ready [2]  60/14 91/19
reality [2]  82/9 82/14
realize [1]  88/14
realized [1]  103/9
really [5]
reason [1]  38/14
reasons [1]  98/8
recall [12]
recalls [2]  87/19 88/4
received [1]  48/24
recognize [8]
recollection [4]
record [5]
recorded [1]  31/25
recounted [1]  83/17
redact [1]  89/22
redactions [3]  89/15 89/16 89/17
redirect [2]  67/18 90/16
reduce [3]  54/14 54/17 54/18
reference [16]
referenced [1]  102/22
referencing [1]  74/7
referred [2]  91/24 94/17
referring [3]  74/10 101/11 106/2
refresh [4]

refuse [2]  49/6 53/10
refused [3]  49/20 53/23 52/23
regret [5]
regulate [1]  114/13
regulations [1]  108/3
relation [1]  69/1
relevance [3]  66/3 66/9 66/11
relevant [2]  98/3 98/24
remain [1]  33/6
remember [13]
reminded [1]  33/5
repeat [4]
repercussions [3]  116/5 117/6 117/13
rephrase [3]  72/22 106/23 116/21
rephrased [1]  116/24
replaces [1]  45/11
report [3]  75/6 75/15 98/17
reported [1]  120/5
Reporter [4]
reputation [2]  61/12 61/16
requested [1]  35/10
residents [1]  51/8
rest [5]
result [2]  63/5 75/7
resume [1]  33/2
retrieve [1]  43/11
returned [1]  46/23
revenge [1]  67/14
review [2]  91/16 108/10
reviewed [3]  105/10 105/13 105/22
reviewed it [1]  105/13
reviewing [2]  108/2 108/5
Richardson [1]  62/8
RICO [2]  48/8 48/11
right [154]
risk [1]  90/16
RMR [1]  31/21
Road [1]  51/9
Rob [23]
ROGER [1]  31/8
role [7]
Ron [5]
Ron's [1]  72/20
Rule [3]  54/10 54/20 55/21
rules [1]  108/3
ruling [2]  71/3 103/17
rumor [1]  61/10
run [1]  99/17
RWT [1]  31/3
RWT-12-0480 [1]  31/3

**S**

S-10 [1]  36/11
S-11 [2]  40/3 46/12
S-21 [1]  41/12
S-3 [1]  35/14
S-4 [1]  35/18
S-5 [1]  35/25
S-6 [5]
S-7 [1]  36/1
S-8 [2]  38/21 38/24
S-9 [2]  37/21 38/21
safety [1]  115/6
said [90]
said to [1]  103/13
same [7]
SANDRA [5]
saw [6]
say [23]
saying [17]
says [12]
scale [1]  41/9
scared [1]  84/5
Schering [1]  51/9

scratch [1]  42/20
scream [5]
scribble [1]  42/23
second [2]  88/21 89/24
secure [1]  61/18
see [27]
see how [1]  44/9
seek [2]  66/14 67/13
seeking [1]  67/9
seems [2]  95/19 95/19
seen [1]  77/15
send [2]  38/19 47/10
sent [3]  37/18 78/5 85/2
sentence [7]
September [6]
September 11 [3]  104/7 104/17 105/21
September 11th [1]  34/18
series [1]  118/15
serving [3]  48/3 48/21 56/16
set [1]  36/3
several [4]
she [17]
sheet [1]  44/18
shooter [5]
shooting [2]  88/19 92/23
shorthand [2]  120/6 120/13
shot [42]
shots [1]  93/18
should [9]
show [2]  34/4 36/12
showed [5]
showing [11]
shown [2]  93/4 105/1
shows [4]
sign [6]
signing [1]  52/17
Silverman [1]  38/1
similarly [1]  50/4
simply [3]  99/8 104/2 107/9
sir [166]
sister [4]
sister's [2]  41/3 43/14
sit [1]  108/10
sits [1]  87/25
sitting [1]  108/18
situation [2]  111/13 114/5
slander [1]  64/23
slang [1]  61/7
slip [1]  113/15
slow [3]  66/1 66/17 67/11
smart [1]  33/24
Smith [9]
snitch [6]
so [83]
some [19]
somebody [13]
somebody's [2]  58/18 88/7
somehow [3]  80/8 80/16 112/3
someone [4]
someone's [4]
something [21]
Sometimes [1]  58/4
somewhere [1]  83/25
sorry [9]
sounds [3]  56/14 80/4 85/15
source [1]  59/18
South [1]  31/12
SOUTHERN [1]  31/2
speak [1]  53/23
speaks [1]  89/8
specific [1]  86/4
specifically [3]  33/12 44/3 114/8
Speculation [1]  117/7

## S

spelled [1]  46/2
spending [1]  111/19
spoke [8]
staff [2]  44/24 45/2
stand [5]
Standing [1]  43/22
stands [1]  101/16
Stanley [3]  72/17 72/19 95/2
started [1]  34/14
state [2]  72/21 97/18
stated [1]  94/18
statement [19]
statements [1]  102/10
STATES [7]
stating [1]  93/15
station [1]  45/16
status [1]  60/25
stay [6]
staying [1]  97/11
stenography [1]  31/25
step [1]  71/2
Steve [1]  38/1
still [1]  76/6
STOKES [8]
stop [1]  66/2
story [2]  34/9 42/8
strategy [1]  52/18
street [4]
stuff [2]  78/24 82/21
stupid [1]  64/25
subject [2]  70/25 88/5
subjects [1]  117/10
suborn [1]  55/15
suborned [1]  49/23
subpoenaed [1]  34/17
subscribed [1]  120/15
substantial [4]
substantially [2]  56/1 56/25
sucker [4]
suggested [1]  98/25
Suite [1]  31/19
summarized [2]  73/1 73/9
summer [1]  34/10
Sun [1]  81/9
supposed [2]  41/17 42/10
supposedly [3]  84/10 92/16 95/16
sure [13]
surely [1]  105/15
suspicious [1]  99/6
sustain [1]  115/23
sustained [25]
swear [1]  95/9
sworn [1]  65/8
system [3]  60/9 60/12 60/23

## T

T.V [4]
TABLE [1]  32/1
tag [2]  41/9 41/14
take [6]
taken [1]  120/13
takes [2]  82/13 82/19
talk [8]
talked [5]
talking [18]
talks [1]  92/13
tape [1]  120/14
teens [1]  80/15
tell [18]
telling [9]
terms [1]  42/8 116/14

territory [2]  88/20 102/16
testified [26]
testify [10]
testifying [16]
testimony [18]
than [2]  61/11 103/4
Thank [10]
that [426]
that's [81]
their [7]
them [30]
then [21]
there [43]
there's [8]
these [9]
they [47]
they're [1]  36/5
they've [2]  56/7 98/18
thing [8]
things [13]
think [39]
third [5]
Thirty [1]  80/13
this [124]
those [7]
though [7]
thought [10]
threat [4]
threaten [1]  62/4
threatened [3]  50/4 62/3 67/19
three [8]
through [7]
throughout [1]  87/24
throw [1]  46/2
Thursday [1]  105/7
time [29]
times [1]  81/17
timing [1]  99/6
title [1]  83/2
TITUS [1]  31/8
today [12]
today's [1]  87/4
together [5]
told [76]
too [1]  103/9
top [4]
torn [3]  44/10 44/16 44/21
totally [1]  93/3
touch [2]  40/13 40/14
touched [1]  40/15
towards [3]  114/20 115/14 115/18
transcript [2]  31/25 120/12
trial [16]
tried [8]
Trooper [1]  87/19
Troy [45]
Troy's [2]  92/19 110/23
true [10]
truth [20]
truthful [2]  85/6 86/6
try [4]
trying [10]
turned [3]  66/13 67/8 107/16
Turner [2]  50/5 51/19
twice [2]  61/19 83/14
two [12]
two-point [1]  53/12
type [3]  39/4 45/14 106/12
types [1]  65/25

## U

U.S [1]  33/10
Um [2]  93/14 107/14

Um-hum [2]  93/14 107/14
unavailable [1]  63/18
under [3]  35/6 94/24 99/13
underlined [1]  94/16
underneath [1]  68/6
understand [5]
undue [1]  99/14
unfair [1]  99/14
unhappy [1]  66/11
unit [2]  43/8 47/4
UNITED [7]
unless [6]
up [15]
upon [2]  55/22 120/7
upward [5]
us [20]
use [6]
used [7]
using [2]  58/22 118/24
usually [1]  39/4

## V

vaguely [2]  42/21 42/22
value [1]  99/16 103/12
vengeance [3]  64/5 66/14 67/9
veracity [1]  101/6
versions [1]  107/5
versus [1]  120/8
very [9]
violence [5]
voice [1]  49/13

## W

wait [3]  43/16 62/22 72/14
waited [1]  43/9
walked [1]  43/8
walking [1]  90/1
want [25]
wanted [6]
wants [1]  65/8
Warren [1]  96/16
was [196]
Washington [1]  31/20
wasn't [17]
waterfront [1]  112/18
way [16]
ways [1]  82/1
we [41]
we'll [2]  66/2 89/19
we're [10]
we've [2]  52/24 112/17
weapon [1]  78/3
Wednesday [1]  105/7
week [6]
well [88]
well-read [1]  81/19
went [10]
were [59]
weren't [7]
whacked [2]  97/18 97/20
what [125]
what's [8]
Whatever [1]  78/9
when [61]
when he [1]  107/18
Whenever [1]  83/11
where [18]
whereof [1]  120/15
whether [14]
which [11]
Whichever [1]  83/14
while [2]  49/3 110/4
who [34]

128

## W

who's [3]  59/17 62/8 64/8
whoever [3]  56/5 69/1 69/2
whole [5]
whom [1]  98/4
whose [4]
why [22]
WILKINSON [5]
will [8]
Williams [2]  51/10 51/18
willingness [1]  70/18
wish [1]  65/25
withdraw [1]  86/20
within [2]  61/19 83/8
without [7]
witness [23]
witnesses [12]
won't [3]  58/15 81/23 103/1
word [3]  60/15 61/12 102/25
words [6]
work [2]  76/25 104/15
worked [3]  58/12 106/15 106/16
world [1]  60/8
worth [3]  63/20 63/21 63/23
would [37]
wouldn't [4]
wrap [1]  112/18
wrath [1]  103/16
write [8]
writing [9]
written [6]
wrong [3]  87/20 106/4 108/21
wrote [25]

## Y

yard [3]  79/11 80/2 81/4
yeah [5]
year [2]  81/3 83/8
years [8]
yes [154]
yesterday [14]
yet [2]  89/5 99/5
you [543]
you'll [1]  62/25
you're [22]
you've [26]
young [1]  58/11
your [109]
yourself [2]  39/24 54/4

## Z

Zucker [64]